HAMIEL, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 77–207–CR. Submitted on briefs November 7, 1979.—Decided December 4, 1979.*

(Also reported in 285 N.W.2d 639.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, *Molly Kealy,* assistant state public defender, and *Jan M. Hefti,* of counsel, of Milwaukee.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *David J. Becker,* assistant attorney general.

COFFEY, J.   This matter is before the court on two writs of error, requesting a review of a judgment of conviction and an order denying a motion for judgment notwithstanding the verdict and, in the alternative, a request for a new trial.

A criminal complaint was issued against John Lee Hamiel, Jr. (hereinafter the defendant) charging him with party to the crime of attemped robbery, contrary to secs. 943.32(1)(b), 939.32 and 939.05 of the Wisconsin Statutes. The defendant moved to dismiss the action on the grounds of the insufficiency of the evidence presented at the preliminary hearing.

The trial commenced April 13, 1976, before Judge Victor Manian. Prior to selecting the jury the defendant

made a motion to adjourn the case so that he could hire an attorney other than the attorney appointed for him by the court. The court denied the motion. The defendant then requested the opportunity to represent himself. The court denied the motion for the following reason:

"I think that the timing of that request is not proper on the morning of trial with the jury sitting in, the jury panel sitting in the courtroom to ask to defend yourself. I think it puts an unreasonable burden on the court and on the prosecutor, particularly when Mr. Mulligan [the court appointed attorney] has been with this case from its inception and has prepared and is prepared to proceed this morning."

Following the selection of the jury the defendant made a motion to suppress the photographic, lineup and courtroom identifications claiming the procedures used in each instance to be suggestive and thus in violation of his constitutional rights. The court found ". . . the identification made by each of the respective witnesses was based upon that witness' independent recollection and observation and not upon any improper influence or suggestion of any kind" and denied the defendant's motion to suppress.

The state called Amelia Mazurcek, who lived in the vicinity of Andrew's Pharmacy, as its first witness. She testified that on October 2, 1975, while looking out her kitchen window, she noticed a dark blue car going the wrong way on a one-way street and subsequently saw the driver park the car on 20th Street. She stated she saw 3 black men get out of the car and walk to Hampton Avenue and turn east on Hampton. Later she saw the same 3 men "running real fast," jump into their car and speed off.

The state's second witness was Dorothy Long, a customer at Andrew's Pharmacy during the attempted robbery. She testified that she saw 3 men, one of whom was

the defendant, enter the pharmacy. While in the pharmacy she stated she saw the defendant standing near the counter and heard him say to the cashier that "He had a gun." She also stated that the defendant had his hand in his jacket pocket when he stated he had a gun. She testified that she next saw the owner of the pharmacy walking from the back of the store toward the cashier's counter and the 3 men then ran out of the store. After the 3 men fled, she saw the owner go outside and stop a passing police car.

Next the state called Cheryl McQueen, the clerk on duty at the cash register at the time of the attempted robbery. She stated that a man, who she later identified as the defendant, came up to her at the sales counter and asked to exchange a $5 bill and five $1 bills for a $10 bill. After she made the exchange, the defendant turned and walked to the back of the store. Moments later, the defendant returned to the counter and demanded that she "bag the money." She stated that when the defendant told her to bag the money he said "I got a gun" and had his hands in his pockets. She said she began to remove the money from the cash register, but before she could put the money in a bag the defendant suddenly turned around and walked out fast. She testified that after the defendant left the store she saw the owner of the pharmacy go outside and flag down a passing police car.

The state's fourth witness was Annette Singleton, also an employee at Andrew's Pharmacy on October 2, 1975. She testified that she approached a black man at the sales counter, whom she later identified as the defendant, and asked if she could help him and he failed to respond. She then noticed Cheryl McQueen, another employee, taking money out of the cash register. She stated she then realized that the defendant ". . . was trying to rob the place." Furthermore, when she began to move away from the counter the defendant told her: "Don't, stay

right here, if you go back there I will shoot her." A short time later she saw a police paddy wagon pull around the corner and at approximately the same time she saw the police, the defendant and the two other men ran out of the store without the money. She said she thought they left because they also saw the police. After the defendant left she stated that she ran to the owner and he, in turn, went outside to get the police.

Next the state called Raymond Madritsch, the owner of Andrew's Pharmacy, to testify. He stated he was working in the rear of the pharmacy on the day of the attempted robbery and noticed 3 men enter the store, two of the men went to the back of the store and he, in turn, went to see what they wanted. He said that one of the men asked for cocoa butter, but when he showed him the cocoa butter the man refused the same. The owner then noticed one of the men at the front of the store but didn't see anything unusual happening so he started walking back to the rear. While walking to the back of the store, he saw the 3 men running down Hampton Avenue. After the 3 men fled he testified that he went out to flag down a police paddy wagon which was just driving past and told them ". . . I thought we had a holdup going on at the store."

The state's last witness was Allan Quosig, Sr., a Milwaukee police officer who investigated the attempted armed robbery. He testified that he showed several photographs to the owner and his employees and that the clerks identified the defendant's picture. He further testified that he was present at a police lineup on October 7th, at which time Cheryl McQueen, Annette Singleton and Dorothy Long all identified the defendant as the man who attempted to rob the pharmacy.

The defense moved for dismissal of the action contending that the state failed to prove one of the elements of

an attempt, *i.e., "the intervention of another person or some other extraneous factor."* The state contended that a police car was in the vicinity of the pharmacy at approximately the time of the attempted robbery provided the extraneous factor. The trial court, in denying the defendant's motion for dismissal, found two possible extraneous factors that may have intervened and prevented the defendant from completing the robbery:

1. The fact that the store owner had started walking toward the cashier's register at the front of the store; or

2. The existence of a police squad car patrolling in the area at the time of the robbery.

The only witness the defense called was John Lee Hamiel, Jr., the defendant, who testified that he was not familiar with Andrew's Pharmacy and that he was not present in any drug store on October 2, 1975. The defendant stated that he had been in his apartment, that he shared with his sister, from 2 p.m. until 7 p.m. and was not in the vicinity of Andrew's Pharmacy. Further, he testified that he could not have been at the pharmacy at the approximate time of the crime, 5:45 p.m., as he was at home watching the news on television between 5:30 and 6:30 p.m. On cross-examination the defendant said his sister had left the apartment around 1 or 2 p.m. and thus he was home alone. At the conclusion of the trial the jury found the defendant guilty of being a party to the crime of attempted robbery. The court sentenced the defendant to an indeterminate term of not more than 4 years.

Following his conviction and sentencing the defendant moved for judgment notwithstanding the verdict stating that the prosecution failed to show the intervention of another person or factor, or in the alternative, he requested a new trial on the grounds that he was denied his request to conduct his own defense. The court sum-

marily denied the defendant's motion and thereafter on February 2, 1977, filed a written order confirming the denial.

*Issues*

1. Is proof of the existence of the intervention of another person or some other intervening extrinsic force a specific element of a criminal attempt under sec. 939.32(2), Stats?

2. Was there sufficient evidence adduced at trial to establish the existence of an intervening extraneous factor in this case?

3. Did the trial court improperly deny the defendant's request to proceed without counsel when he attempted to discharge the court appointed attorney on the day of trial and thus violate his right to self-representation as provided in the Sixth Amendment to the United States Constitution and art. I, sec. 7 of the Wisconsin Constitution?

The defendant on appeal claims that sec. 939.32(2), Stats.,[1] (the general attempt statute) requires the state to establish the existence of a specific intervening extrinsic force as a necessary element. The question of whether intervention of an extraneous factor is an element of an attempted crime initially arose in the case of *Berry v. State,* 90 Wis.2d 316, 280 N.W.2d 204 (1979). In that case the issue was whether an accused could properly be convicted of an attempt where there was sufficient evidence to establish the completed crime. This court stated

[1] "932.32 Attempt (1) . . .

"(2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor."

in *Berry v. State, supra,* that sec. 939.32(2) did not set forth as a separate element the intervention of an extrinsic force beyond the control of the accused:

". . . Like common law attempt, the statutory crime has two elements, a criminal intent and some acts in furtherance of the intent. The provision that the acts required to establish criminal attempt be ones which demonstrate that the actor would commit the crime 'except for the intervention of another person or some other extraneous factor' *does not add an additional, separate requirement that the attempt be thwarted by an outside force.*" (emphasis supplied) *Id.* at 326.[2]

At common law, the two elements of the crime of attempt were the *intent* to commit a substantive crime *(mens rea)* and *acts* taken in furtherance of the crime intended *(actus reus). Berry v. State supra; Bethards v. State,* 45 Wis.2d 606, 173 N.W.2d 634 (1970). The primary justification for punishing an actor for a criminal attempt to commit a crime is usually said to be not his *actus reus,* but his *mens rea,*[3] *i.e.,* his intent.

However, in the crime of attempt, it is primarily the acts of the accused which provide evidence of the requisite mental intent. The acts of the accused committed in furtherance of the intended substantive crime ". . . must not be so few or of such an equivocal nature as to render doubtful the existence of the requisite criminal intent." *Berry v. State, supra* at 327.

The primary consideration in an attempt statute is therefore the acts of the accused. The acts must be per-

---

[2] A 1960 Wisconsin Law Review article, NOTE: *Criminal Law-Attempts-The Damms Case and the General Attempt Statute;* and the comments of the legislative council which drafted the criminal code, *The Judicial Criminal Code,* Vol. 5, p. 29 (1953) corroborate the holding in *Berry* that the statutory crime of attempt has only two elements—the intent and the act.

[3] R. Buxton, *Inchoate Offences: Incitement and Attempts,* 1973 Crim. L. Rev. 656, 660.

formed *in actual furtherance of the intended crime* and must establish that the accused intended to commit the substantive crime. *See:* C. Kenny, *Outlines of Criminal law.* ¶63 (19th ed. 1966) in which the author commented as follows:

"In other words the accused must have actually done things which are steps intentionally taken in furtherance of some specific aim, and which themselves are enough to suggest clearly what that specific aim was . . . . It is true that the criminality of the attempt lies in the intention, the *mens rea*, but this *mens rea* must be evidenced by what the accused has *actually done towards the attainment of his ultimate objective.*" *Id.* at 104.

Numerous tests have been proposed for ascertaining the point at which the acts of the accused are sufficient to impose criminal liability for an attempt. *See: Berry v. State, supra* at 325, n. 7. The test embodied in sec. 939.32(2), Stats., requires a determination of whether the accused has taken sufficient steps in furtherance of the intended crime "which *demonstrate unequivocally,* under all the circumstances that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor." (emphasis supplied). *Id.* at 326.

In *Berry v. State, supra,* this court stated the import of the equivocality test was that: "The defendant's conduct must pass that point where most men, holding such an intention as the defendant holds, would think better of their conduct and desist." *Id.* at 326, quoting R. Skilton, *The Requisite Act in a Criminal Attempt,* 3 U. Pitt. L. Rev. 308, 309–10 (1937). This approach is commonly called the "probable desistance" test. Under this test, the court must determine whether the defendant's words and actions reached a point where he is unlikely thereafter to voluntarily abandon his efforts to complete the

crime. *See also:* W. LaFave & A. Scott, *Criminal Law,* pp. 434–35 (1972).

The statutory language of sec. 939.32(2), Stats., embodies the "equivocality" test and requires that the acts of the accused must "demonstrate unequivocally" that he is unlikely to voluntarily withdraw from the criminal scheme. Note, 1960 Wis. L. Rev. 516, 525. Under this approach, the *actus reus* of attempt is reached when the accused's actions demonstrate clear and unambiguous *prima facie* evidence of the requisite *mens rea. See:* W. LaFave & A. Scott, *supra* at 435–36. In other words, there must be a determination, under all the facts and circumstances, of whether the actions of the accused can lead to no other reasonable conclusion than that he intended to "attain a result which, if accomplished, would constitute" the crime.[4]

■

In *Berry v. State, supra,* this court held that where the intervention of another person or other extrinsic force prevents completion of the criminal act it is indicative of the fact that the defendant intended to commit the crime because it shows that he did not voluntarily cease from completion of the crime:

> ". . . [f]ailure, if and by whatever means the actor's efforts are frustrated, *is relevant and significant only insofar as it may negate any inference that the actor did in fact possess the necessary criminal intent to commit the crime* in question." (Emphasis supplied.) *Id.* at 327.

---

[4] As one commentator put the test:

"If the example may be permitted, it is as though a cinematograph film, which has so far depicted merely the accused person's acts without stating what was his intention, had been suddenly stopped, and the audience were asked to say to what end those acts were directed. If there is only one reasonable answer to this question then the accused has done what amounts to an 'attempt' to attain that end. If there is more than one reasonably possible answer, then the accused has not yet done enough." J.W.C. Turner, *Attempts to Commit Crimes,* 5 Cambridge L. J. 120, 237–38 (1934).

Therefore, it was not necessary for the state to establish as a separate element, the intervention of another person or some other extraneous factor which prevented the defendant from completing the criminal act. We do not interpret *Adams v. State,* 57 Wis.2d 515, 204 N.W.2d 657 (1973) and *Dunn v. State,* 55 Wis.2d 192, 197 N.W.2d 749 (1972) as establishing ". . . the intervention of another person or some other extraneous factor" as an essential element of the offense of attempt, sec. 932.32(1), Stats.

In order for the defendant to be found guilty of attempted robbery pursuant to sec. 943.32 and sec. 939.32 (2) (the general attempt statute), Stats., it must only be shown that: (1) the defendant's actions in furtherance of the crime clearly demonstrate, under the circumstances that he had the requisite intent to commit the crime of attempted robbery; and (2) that having formed such intent the defendant had taken sufficient steps in furtherance of the crime so that it was improbable that he would have voluntarily terminated his participation in the commission of the crime. The record in this case clearly demonstrates that the defendant and two companions entered the pharmacy together. Shortly thereafter, the defendant told one of the clerks to "bag the money" and stated either, "I got a gun" or "I will shoot you." Furthermore, he stated, "I'm not jiving, and don't move. I got a gun." When another clerk approached the defendant at the counter the defendant ordered her "Stay right here, if you go back there I will shoot her." These acts clearly demonstrate that the defendant had the intent to commit the crime of robbery and establish unequivocally that it was improbable that the defendant would voluntarily desist from his criminal acts.

The record also establishes the existence of two possible intervening extraneous factors which may have caused the defendant to abandon the robbery scheme:

(1) the fact that the pharmacy owner approached the front of the store while the robbery was in progress and (2) the appearance of a police paddy wagon outside the pharmacy. The parties do not agree about whether there was sufficient evidence presented to show a "causal connection" between either of these two circumstances. The defendant asserts that the witnesses present at the pharmacy at the time of the attempted robbery were unable to establish with their testimony a causal connection between the owner's approaching the front of the store and the defendant's departure from the store. The defendant also argues that only one of the 4 witnesses present testified that the paddy wagon arrived *prior to* the defendant's departure from the store. The defendant holds that since this witness could only state that she guessed that the defendant also saw the paddy wagon, there was an insufficient basis upon which the court could find the arrival of the police as the necessary intervening factor that frustrated the defendant's attempt at committing the robbery.

However, whether another person or some other intervening extrinsic force are present and actually frustrate the accused person's attempt is not material to the inquiry of the defendant's guilt. The key inquiry is a determination of whether, under all the facts and circumstances, the accused was likely to voluntarily cease and desist from completion of the criminal act. There is no need to show a causal connection between any extrinsic force and the frustration of the defendant's plan. We hold there was sufficient evidence in the record for the jury to conclude beyond a reasonable doubt that the defendant did not voluntarily abandon his plan to commit the crime of attempted robbery.

The defendant also claims that the trial court erred in denying his motion to proceed *pro se, i.e.,* to represent himself. The record in this case establishes that on the

morning of the trial, after the jury had been called, the defendant, in chambers, requested an adjournment for the purpose of securing private counsel of his own choice rather than his court appointed attorney. The court appointed attorney stated that he was ready to proceed at that time, but the defendant said he felt that he did not ". . . have the proper defense, you know, and really, I am just not ready to stand trial for this." After the trial court denied the defendant's request the defendant told his attorney that he wanted to represent himself and the attorney informed the court.[5] Following an in-

---

[5] The colloquy was as follows:

"Court: Are you ready to proceed gentlemen?

"Mr. Blumenfield [prosecutor]: Yes, Your Honor.

"Mr. Mulligan [defense counsel]: . . . There is one matter that I think should be taken up before any selection of a jury, and I don't know if the court would want to do that in Chambers or what. ". . .

"Court: Can we select the jury and then dispose of those matters prior to starting the trial or swearing the jury?

"Mr. Mulligan: I would have no objection to that, Your Honor. There is one matter I think should be briefly taken up before we do select a jury, however.

"Court: Okey, we will go in Chambers then. The jury panel may remain where they are."

IN CHAMBERS

"Mr. Mulligan: Your Honor, if it please the court, in my discussion with Mr. Hamiel, he has urged me to ask the court for an adjournment for the following reasons:

"Number One: A sister has been trying to hire someone else, other than a court-appointed attorney. I have been informed last week, via message, I am not sure who it was from, but Attorney Orville Pitts has been retained, but I guess that didn't come into fruition but Mr. Hamiel has asked me this morning to ask the court for an adjournment for time to hire an attorney, and he has also pointed out to me that the last time we were in court the State requested an adjournment and was granted the adjournment. He feels he is entitled to one also.

chambers conference, the court denied the defendant's request (motion) to proceed *pro se* and the trial proceeded with his appointed counsel.

"Possibly he can answer any other questions the court might have about the situation.

"Court: Is there anything you wish to add, Mr. Hamiel?

"Mr. Hamiel: He said just about everything that I would have said. I just not—I don't feel that I am ready and a defense. I don't have the proper defense, you know, and really, I am just not ready to stand trial for this.

"Court: Well, this case has been pending for some time.

"Mr. Blumenfield: Goes back to October of . . . [1975].

"Court: The information was filed October 16, 1975.

"Mr. Blumenfield: The offense occurred October 2nd. All the State's witnesses are present in Court.

"Court: The other—

"Mr. Hamiel: I have been in custody ever since that arrest.

"Court: Mr. Bobo's case, the alleged co-defendant, was severed. That has been tried. The court, we are in the process of trying that case, also.

"The motion to adjourn is denied. The jury is here, the witnesses are all here. This is the first time that it has been mentioned, as far as I know.

"The jury panel is sitting in the courtroom, the case has been scheduled for trial for some period of time for today, and we are going to proceed.

"Mr. Mulligan: The defendant would like to defend himself, Your Honor, without counsel.

"Court: Do you have any legal training?

"Mr. Hamiel: No, not very much. I just know from reading.

"Court: How do you intend to defend yourself?

"Mr. Hamiel: The best way I can.

"Mr. Mulligan: Your Honor, for the record, I might point out that I am prepared to proceed today. I might also point out that I would be more than willing to assist Mr. Hamiel if he did want to pursue it himself.

"I think it should also be pointed out to the court that as the court can see, Mr. Hamiel has in front of him copies of the transcript of the preliminary, of the complaint, and the like, I provided him with most of those copies.

"A look at the Court file will also show that he has filed, I believe what, one or two habeas corpus motions on his own?

The United States Supreme Court in *Faretta v. California,* 422 U.S. 806, 45 L. Ed.2d 562, 95 S. Ct. 2525 (1975), held that a defendant in a criminal trial has an independent constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. *Id.* at 807. The Court, after an analysis of English and Colonial practices as to the right to self-representation, held that ". . . Although not stated in the [Sixth] Amendment in so many words, the right to self-repre-

"He has kept very abreast with this case. I also point out that this is the first time I have heard of those thoughts of representing himself, just now, but he has kept abreast of this case.

"Depending upon the court's desire, I would be happy to either try the case, to help him out, or whatever the court desires, Mr. Hamiel desires.

"Court: Well you have a right to represent yourself if you choose to, Mr. Hamiel. It is not my decision to make as to whether that is a wise course of action for you to pursue or not. That is your decision. I don't think it is wise.

"I think that the timing of that request is not proper on the morning of trial with the jury sitting in, the jury panel sitting in the courtroom to ask to defend yourself. I think it puts an unconscionable burden on the court and on the prosecutor, particularly when Mr. Mulligan has been with this case from it's [sic] inception and has prepared and is prepared to proceed this morning.

"Your motion to represent yourself is denied.

"Mr. Hamiel: I don't have the right to do that?

"Court: Yes, you have the right to do it, but you have to do it within the certain rules. You can't come in here at the last minute and say, 'I want to defend myself.'

"This case has been pending since last October. Mr. Mulligan is very competent, very efficient, very knowledgeable and experienced criminal attorney. He will work very closely with you, I am sure that he will express your theory of defense very adequately. He will confer with you. He will make sure that whatever point you feel should be advanced will be advanced, and give you every opportunity to defend yourself and to defend this case in the manner in which you feel it should be defended.

"Mr. Hamiel: You are the boss. Okey, I can't say nothing yet?"

sentation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment." *Id.* at 819.[6] The Court in *Faretta v. California, supra,* held that the minimum procedural requirements afforded to a defendant by the Sixth Amendment, including the right to the assistance of counsel, were intended to supplement the right of the defendant to proceed *pro se. Id.* at 816.

However, as Mr. Justice BLACKMUN in his dissent in *Faretta v. California, supra,* points out the Court did not address the procedural problem of "How soon in the criminal proceeding must a defendant decide between proceeding by counsel or *pro se?" Id.* at 852. The question of when a defendant must request to proceed *pro se* did not present itself in that case as the defendant asserted his right to self-representation several weeks before trial. *Id.* at 835.

Jurisdictions which have considered the question have reached different conclusions:

1. In *Russell v. State,* — Ind. —, 383 N.E.2d 309 (1978), the Indiana Supreme Court held that ". . . the right of self-representation must be asserted within a reasonable time prior to the day on which the trial begins. Morning of trial requests are thus per se untimely." *Id.* at 314; or

2. In *People v. Windham,* 19 Cal.3d 121, 137 Cal. Rptr. 8, 560 P.2d 1187 (1977) the California Supreme Court stated that a defendant has an unqualified right to self-

---

[6] Sixth Amendment to the United States Constitution.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

representation if he makes such a request "within a reasonable time prior to the commencement of trial." *Id.* at 1191. If he does not make such a request within a reasonable time prior to commencement, his request is addressed to the "sound discretion" of the trial court to determine whether he may proceed *pro se. Id.* at 1191. In deciding whether to exercise its discretion the trial court should consider a number of factors, including the quality of counsel's representation, reasons for the request to proceed *pro se,* length and stage of the proceedings and the disruption or delay which might reasonably be expected to follow.

While this court has never specifically considered the question of when a defendant must assert the right to represent himself at trial, we hold that under the circumstances of this case the defendant's request to proceed *pro se* was properly denied by the trial court. The Sixth Amendment of the United States Constitution, which provides the defendant with the right of self-representation, is a "trial-centered" amendment. It guarantees the right to make an effective *defense.* When the guarantees of the amendment are used for anything but to assure the defendant a *fair trial* the amendment is misused.

It is evident that the defendant's interest in the adversary system is in receiving a fair trial. The Sixth Amendment seeks to ensure this. On the other hand, the state also has an important interest to assert. That interest is in avoiding any interference with the orderly administration of justice and preserving the integrity of the trial process.

This court has held that "the right to *counsel* cannot be manipulated so as to obstruct the orderly procedure for trials or to interfere with the administration of justice." (Emphasis supplied.) *Rahhal v. State,* 52 Wis.2d

144, 147–48, 187 N.W.2d 800 (1972). Last minute changes of counsel can have a significantly adverse effect on the judicial system. The same considerations in avoiding obstruction to the orderly administration of justice apply when the right involved is that of self-representation. Both the right to secure other counsel and the right to proceed *pro se* are guaranteed by the Sixth Amendment and are intended to ensure the defendant's right to a full and fair trial, they are not intended to allow the defendant the opportunity to *avoid or delay* the trial for any unjustifiable reason.

Where the request to proceed *pro se* is made on the day of trial or immediately prior thereto, the determinative question is whether the request is proffered merely to secure delay or tactical advantage. In such a situation, the trial court should determine if the request could have been made earlier, and if so, why not. If the defendant cannot show good cause as to why a demand was not made at an earlier appearance before the court, and if an adjournment would result from a granting of the defendant's self-representation request, the trial court must weigh the defendant's constitutional guarantee to a fair trial as well as the convenience of the witnesses, jurors, and the court schedule when exercising its discretion to approve or deny the request. *See, e.g.: People v. Hall,* 87 Cal. App.3d 125, 150 Cal. Rptr. 628 (1978).

In this case the defendant requested an adjournment in order to secure private counsel on the morning of the trial. The court had appointed counsel to represent the defendant 6 months before the trial. Counsel made four appearances with the defendant prior to trial and had spent countless hours in preparation for trial. After weighing all the circumstances, the court denied the request for adjournment and only then did the defendant request that he be able to proceed *pro se.* In this case,

Hamiel failed to explain the untimeliness of his request for an adjournment, substitution of private counsel, and finally the request to proceed *pro se,* thus we hold that the court properly exercised discretion in balancing the defendant's untimely requests against the convenience of the witnesses, the jurors and the administration of justice. If the court had granted the defendant the right to proceed *pro se,* it would have necessitated the granting of a continuance to allow the defendant the time to prepare a proper defense. Thus, under the circumstances of this case, it is apparent that the primary objective of the defendant's motions was a further delay of the trial. Therefore, we hold that a trial judge's denial of an initial request for substitution of counsel or to proceed *pro se,* at the moment of trial and some 6 months after the appointment of the attorney, is not an abuse of discretion.

*By the Court.*—Judgment and order affirmed.