**Mark E. COLLIER, Appellant–
Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 76A04–0503–CR–142.

Court of Appeals of Indiana.

April 27, 2006.

Transfer Denied July 20, 2006.

Susan K. Carpenter, Public Defender of Indiana, David P. Freund, Deputy Public Defender, Indianapolis, for Appellant.

Steve Carter, Attorney General of Indiana, Ryan Johanningsmeier, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Mark Collier appeals his conviction for the attempted murder of his estranged wife. Specifically, he argues that his conduct did not constitute a substantial step toward commission of the crime of murder, as required by Indiana's attempt statute, but was instead mere preparation. We agree, and therefore we reverse Collier's conviction for attempted murder.[1]

### Facts and Procedural History

Collier married his wife, Nancy, on May 24, 1986. Nancy separated from Collier and moved out of their home on March 22, 2003. On March 24, 2003, Nancy obtained an Ex Parte Order for Protection in which Collier was ordered to stay away from Nancy's place of employment, Cameron Hospital in Angola, Indiana. Nancy filed for divorce on April 8, 2003.

On April 24, 2003, Nancy was working the 2:30–10:30 p.m. shift at the hospital. That day, Collier went to the home of his neighbor, Charles Cameron, at approximately 3:00 p.m. According to Cameron, Collier was upset because "he thought he was gonna lose his home because him and his wife were gettin' divorced." Tr. p. 170. Collier told Cameron that "he was gonna kill his wife and himself" and then went home. *Id.* Cameron thought Collier "was just talking" because Collier had said similar things before but "had never actually done anything." *Id.* at 171.

At approximately 5:30 p.m., Collier returned to Cameron's home and said, "To-night's the night." *Id.* at 172. As the two walked back to Collier's house, Collier again told Cameron that he was going to kill his wife and himself. Once back in Collier's house, each of them drank a beer and Collier eventually "dozed off in his chair." *Id.* Cameron "thought it was over" and went back home. *Id.* At some point during the day, Cameron called Charter Beacon, Northeastern Center, and Collier's ex-boss because he thought Collier needed psychiatric help.[2]

Collier went to Cameron's house again at 8:45 p.m. and told Cameron that he wanted to talk to him. The two walked back to Collier's house and each of them drank another beer. Collier took Cameron upstairs, showed him where the cat litter boxes and cats were, and told him that he could let the cats outside or take them to a shelter. Collier then showed Cameron where the dog food was, asked him to feed his dog, and gave him spare keys to his house and his pickup. Cameron says that Collier then went into his bedroom and "started prayin', you know, telling—saying, 'God, forgive me for what I'm gonna do.' " *Id.* at 173. Collier "[s]tarted kinda cryin'. Then he . . . started kinda chuckling." *Id.* He then came out of his room, hugged Cameron, and told him, "Tonight's the night. I'm gonna do it." *Id.* Collier collected an ice pick, a box cutter, and a pair of binoculars and said, "I'm gonna stab her in the effin' heart twice. I'm gonna cut her effin' throat." *Id.* Collier also said that he would ram Nancy with his pickup. *Id.* at 174. Collier

---

1. We heard oral argument in this cause on February 20, 2006, at Valparaiso University School of Law. We thank counsel for their able presentations and the students, faculty, and staff of the law school for their hospitality.

2. Charter Beacon and Northeastern Center provide behavioral health services in northeast Indiana. *See* http://www.ftwayne.in.us/health_living/mental_health_substance_abuse.html (last visited March 28, 2006) and http://www.nec.org/ (last visited March 28, 2006).

left in his pickup at approximately 9:00 p.m. and headed towards Angola.

A few minutes after Collier left, Cameron himself left to drive to work. During the drive, he saw Collier driving back toward his house and away from Angola. Sometime between 9:30 and 10:00 p.m., Collier arrived at the house of another of his neighbors, Billy Fansler. Fansler says that Collier told her that "he was going to end it and he had had enough." *Id.* at 198. Collier also told Fansler "to tell [her] husband thank you and tell [her] children God bless them[.]" *Id.* When Collier was at Fansler's house, "he looked kind of wobbly," "he wasn't quite steady on his feet," "he kinda slurred [his speech] a little," and he was depressed and "[m]aybe a little angry[.]" *Id.* at 201–03.

After Collier left, Fansler called Cameron's wife, who told her that Cameron had planned to speak with the police once he reached Hamilton, Indiana, on his way to work. Indeed, Cameron had already stopped and spoken with a police officer, Deputy Marshall Jeremy Warner of the Hamilton Police Department. Cameron says that he told Deputy Warner that Collier was planning to kill Nancy and himself. Deputy Warner, on the other hand, says that Cameron told him only that Collier was planning to kill himself. After speaking with Cameron, Deputy Warner called the Steuben County Sheriff's Department. Deputy Warner and officers from the Steuben County Sheriff's Department then went to Collier's house to try to find him. Fansler went out and explained to the officers that Collier had been at her house but had just left in his pickup and was not at his home.

A friend of Nancy called her at the hospital and told her that the police were searching for Collier. That prompted Nancy to phone the police, who told her to stay in the hospital until she heard otherwise. At approximately 10:40 p.m., Officer Sandy Justice and Officer Robert Cunningham of the Angola Police Department received a radio dispatch to attempt to locate Collier. Shortly thereafter, Officer Justice and Officer Cunningham arrived at the hospital and spotted Collier's pickup. The pickup was backed into a parking space in the last row of the parking lot across the street from the emergency area of the hospital so that Collier would have been able to see the emergency room entrance/exit. This door was the only exit available to those leaving the hospital after 10:00 p.m.[3]

When the officers approached Collier's vehicle, they observed that the vehicle was off, the lights were off, and Collier was inside asleep or passed out. The officers opened the doors of the vehicle and told Collier to exit. It was not until the officers opened the doors that Collier awoke. Once Collier was out of the vehicle, the officers noticed that he was intoxicated and took him into custody. They then searched the interior of the pickup and found an ice pick, a box cutter, a pair of binoculars, and an open container of beer that was partially full. The officers explained to Collier that they were arresting him for invasion of privacy for violating the terms of the protective order and also for public intoxication.

Eventually, however, the State charged Collier with Attempted Murder, a Class A felony.[4] A jury trial was held October 27

---

3. This had been the case since before Nancy separated from Collier, when Nancy usually worked until 11:00 p.m.

4. Ind.Code § 35–41–5–1(a); Ind.Code § 35–42–1–1(1). In the original information, the State alleged that Collier had attempted to "knowingly or intentionally kill" Nancy. Appellant's App. p. 8. On the first day of the

and 28, 2004, at the conclusion of which the jury found Collier guilty. On February 28, 2005, the trial court sentenced Collier to the presumptive sentence of thirty years and suspended five of those years, for a total executed prison term of twenty-five years to be followed by five years of probation. Collier now appeals.

## Discussion and Decision

On appeal, Collier argues that the evidence is insufficient to support his conviction for attempted murder. "Upon a challenge to the sufficiency of evidence to support a conviction, a reviewing court does not reweigh the evidence or judge the credibility of the witnesses, and respects the jury's exclusive province to weigh conflicting evidence." *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005) (internal quotations omitted). We must consider only the probative evidence and reasonable inferences supporting the verdict. *Id.* We must affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.* "To establish attempted murder, the State must prove beyond a reasonable doubt that (1) the defendant acted with the specific intent to kill; and (2) the defendant engaged in conduct constituting a substantial step toward commission of the crime" of murder. *Osborne v. State*, 754 N.E.2d 916, 924 (Ind. 2001) (citing *Mitchem v. State*, 685 N.E.2d 671, 676 (Ind.1997)); *see also* Ind.Code § 35–41–5–1; Ind.Code § 35–42–1–1. Collier contends that his conduct on the day in question did not, as a matter of law, constitute "a substantial step toward commission of the crime" of murder. We must agree.

We have said that a "substantial step" for purposes of the attempt statute is any overt act beyond mere preparation and in furtherance of intent to commit an offense. *Asghar v. State*, 698 N.E.2d 879, 883 (Ind.Ct.App.1998), *reh'g denied, trans. denied.* Whether a defendant has taken a substantial step toward the commission of a crime is generally a question of fact to be decided by the trier of fact based on all the particular circumstances of the case. *Washington v. State*, 517 N.E.2d 77, 79 (Ind.1987); *see also Asghar*, 698 N.E.2d 879 at 883 (citing *Williams v. State*, 685 N.E.2d 730, 735 (Ind.Ct.App.1997)). In making this determination, the focus is on what acts have been completed, not what remains to be done. *Jackson v. State*, 683 N.E.2d 560, 566 (Ind.1997). The completed acts must be strongly corroborative of the firmness of the defendant's criminal intent. *Mitchem*, 685 N.E.2d at 676. Stated differently, the liability of the defendant turns on his purpose as manifested through his conduct. *Zickefoose v. State*, 270 Ind. 618, 623, 388 N.E.2d 507, 510 (1979). Our Supreme Court has described the substantial step requirement as a "minimal one." *State v. Van Cleave*, 674 N.E.2d 1293, 1304 (Ind.1996). How conduct can simultaneously be described as both "substantial" and "minimal" is the dilemma with which we grapple.

Collier acknowledges that the jury could have reasonably found each of the facts alleged in the amended charging information, to wit: (1) he was found in the parking lot at Nancy's place of employment, in a position from which he could see the door Nancy would use to exit the building; (2) when he was found he had in his possession an ice pick, a box cutter, and binoculars; (3) before he was found he had made a statement that he was going to wait for Nancy to come out of work and run her over with his pickup, stab her in

---

trial, however, the trial court allowed the State to amend the information to say that

Collier had attempted to "intentionally kill" Nancy. *Id.* at 46.

the heart, and cut her throat. Appellant's App. p. 46. Nevertheless, he argues that the evidence is insufficient as a matter of law to constitute a substantial step toward murder; he contends that his conduct was mere preparation. We must decide, then, whether evidence that Collier drove to Nancy's place of employment with an ice pick, a box cutter, and binoculars, parked outside the door through which he knew Nancy would exit, then fell asleep or passed out is sufficient to have allowed a reasonable jury to find that Collier had taken a substantial step toward the commission of murder.

The answer to our question is not to be found by analogy to other Indiana cases applying the attempt statute. This is because most Indiana cases in which the substantial step prong of the attempt statute has been at issue have involved some appreciable, direct, physical contact or attempted contact between the defendant and the alleged victim. In the attempted murder context, several cases involve instances in which the victim was shot, stabbed or beaten but did not die. *See, e.g., Harris v. State,* 425 N.E.2d 112 (Ind. 1981) (victim shot in head); *Zickefoose,* 270 Ind. at 618, 388 N.E.2d at 507 (victim beaten, stabbed, and choked); *Cohen v. State,* 714 N.E.2d 1168 (Ind.Ct.App.1999) (victim shot in head), *trans. denied.* In others, the defendant shot or stabbed at the victim but missed entirely. *See, e.g., Bethel v. State,* 730 N.E.2d 1242 (Ind.2000) (defendant shot at intended victim but missed); *Evans v. State,* 727 N.E.2d 1072 (Ind.2000) (defendant swung knife at victim but missed); *Bartlett v. State,* 711 N.E.2d 497 (Ind.1999) (defendant shot at intended victim but missed).

Nor have the cases involving other attempt crimes presented questions as close as the instant case. *See, e.g., Himes v. State,* 273 Ind. 416, 403 N.E.2d 1377 (1980) (affirming attempted rape conviction where defendant pointed gun at intended victim, directed her into a tent, told her, "You know what I want," threatened to shoot her if she ran, grabbed the front of her pants, and struggled with her); *Hampton v. State,* 468 N.E.2d 1077 (Ind. Ct.App.1984) (see section II, below); *Haskett v. State,* 467 N.E.2d 32 (Ind.Ct. App.1984) (affirming attempted robbery conviction where defendant's accomplice went into store with toy gun but then left without pointing gun or demanding money), *reh'g denied, trans. denied.*

■ So where do we go from here? The Indiana Supreme Court has recognized that "[d]eciding what constitutes an attempt has always been a burden upon the common law, challenging even the most respected judges." *Ward v. State,* 528 N.E.2d 52, 53 (Ind.1988) (citing Oliver Wendell Holmes, The Common Law 68 (1881)). One principle the Court has approved is as follows:

> [T]he more serious the crime attempted or the greater the menace to the social security from similar efforts on the part of the defendant or others, the further back in the series of acts leading up to the consummated crime should the criminal law reach in holding the defendant guilty for attempt.

*Id.* at 54 (quoting Francis B. Sayre, *Criminal Attempts,* 41 Harv. L.Rev. 821, 846 (1928)). In this case, then, the seriousness of the crime of murder weighs in favor of affirming Collier's conviction.[5] Still, "[i]t

---

5. We note, however, that because of the stringent penalties for attempted murder and the ambiguity often involved in its proof, our Supreme Court has "singled out attempted murder for special treatment." *Hopkins v. State,* 759 N.E.2d 633, 638 (Ind.2001); *see also Richeson v. State,* 704 N.E.2d 1008, 1010

is impossible to lay down any general rule to determine what acts are too remote to constitute an attempt."[6] *Williams v. State*, 261 Ind. 385, 391, 304 N.E.2d 311, 315 (1973). Therefore, we will not try to formulate a bright-line test to be used to determine whether a defendant's conduct constitutes a "substantial step" for purposes of Indiana's attempt statute. Rather, we will review the origins of Indiana's attempt statute and compare the instant case with another decision from this Court in an effort to provide some measure of clarity in the area of attempt law.

## I. When is Conduct "Strongly Corroborative" of Intent?

Indiana's general attempt statute is based on the Model Penal Code approach to attempt liability. *Zickefoose*, 270 Ind. at 622, 388 N.E.2d at 509. The "substantial step" requirement found in Indiana Code § 35–41–5–1(a) was taken directly from Model Penal Code § 5.01(1)(c), and much of the language found in our Supreme Court's watershed decision *Zickefoose* was borrowed from Model Penal Code § 5.01 and the Comment thereto. *Compare Zickefoose*, 270 Ind. at 622–23, 388 N.E.2d at 509–10 *with* Model Penal Code § 5.01 (Official Draft and Revised Comments 1985), Comment at 297, 329, 331. Specifically, the requirement that the defendant's conduct be "strongly corroborative" of the defendant's criminal purpose, *see Zickefoose*, 270 Ind. at 623, 388 N.E.2d at 510, is grounded in Model Penal Code § 5.01(2). It is to this requirement that we now turn our focus.

We require that a defendant's completed acts be "strongly corroborative" of his criminal purpose because a defendant's conduct is often more indicative of his intent than are his statements, and "equivocal acts may well reflect an equivocal purpose."[7] Wayne R. LaFave, Substan-

---

(Ind.1998) ("Attempted murder is a special case, deserving special treatment.").

6. *See also* Rollin M. Perkins & Ronald N. Boyce, Criminal Law 621 (3d ed. 1982) ("The prepatory-perpetrating dichotomy is useful in discussing situations of a rather general nature, but the actual dividing line between the two is shadowy in the extreme."); Jeffrey F. Ghent, Annotation, *What Constitutes Attempted Murder*, 54 A.L.R.3d 612, 617 (1973) ("The authorities agree that it is impossible to formulate a general rule or definition of what constitutes an attempt (to murder), which may be applied as a test in all cases[.]") (citing *California v. Miller*, 2 Cal.2d 527, 42 P.2d 308 (1935)); Francis B. Sayre, *Criminal Attempts*, 41 Harv. L.Rev. 821, 846 (1928) ("It is [] manifestly impossible to lay down any mechanical or hard and fast rule for the drawing of the line between preparation and indictable attempts; and such efforts in this direction ... must be unhesitatingly rejected.").

7. Indeed, the "strongly corroborative" requirement is an extension of what the drafters of the Model Penal Code labeled as the *"res ipsa loquitur* test." *See* Model Penal Code

§ 5.01, Comment at 330 ("The basic rationale of the requirement that the actor's conduct shall strongly corroborate his purpose to commit a crime is, of course, the same as that underlying the *res ipsa loquitur* view."); *see also* Black's Law Dictionary 1336 (8th ed.2004) (*res ipsa loquitur* is Latin for "the thing speaks for itself"). One commentator has described the *res ipsa loquitur* test, or "equivocality approach," this way:

> [I]t is as though a cinematograph film, which had so far depicted merely the accused person's acts without stating what was his intention, had been suddenly stopped, and the audience were asked to say to what end those acts were directed. If there is only one reasonable answer to this question then the accused has done what amounts to an "attempt" to attain that end. If there is more than one reasonably possible answer, then the accused has not yet done enough.

Turner, *Attempts to Commit Crimes*, 5 Cambridge L.J. 230, 236 (1934) (as quoted in Wayne R. LaFave, Substantive Criminal Law § 11.4(d) (2d ed.2003)). The Wisconsin Supreme Court has called this the "stop the film

tive Criminal Law § 11.4(d) (2d ed.2003) (hereinafter "LaFave"). "Statements of intent made prior to equivocal acts or a confession made subsequent thereto give no assurance of that firmness of purpose which manifests the actor's dangerousness." *Id.* Stated differently, "[a]n attempt is an act of such a nature that it is itself evidence of the criminal intent with which it is done. A criminal attempt bears criminal intent upon its face." *Id.* (quoting J. Salmond, Jurisprudence 404 (7th ed.1924)); *see also Hamiel v. Wisconsin,* 92 Wis.2d 656, 285 N.W.2d 639, 644 (1979) ("[I]n the crime of attempt, it is primarily the acts of the accused which provide evidence of the requisite mental intent."). Therefore, we must necessarily evaluate any statements a defendant may have made *together* with his conduct in order to determine whether that which he has done strongly corroborates that which he said he would do.[8] As the South Dakota Supreme Court has stated:

> The reason for requiring evidence of a direct act, however slight, toward consummation of the intended crime, is … that in the majority of cases up to that time the conduct of the defendant, consisting merely of acts of preparation, has never ceased to be equivocal; and this is necessarily so, irrespective of his declared intent. It is that quality of being equivocal that must be lacking before the act becomes one which may be said to be a commencement of the commission of the crime, or an overt act, or before any fragment of the crime itself has been committed, and this is so for the reason that, so long as the equivocal quality remains, no one can say with certainty what the intent of the defendant is.

*South Dakota v. Martinez,* 88 S.D. 369, 220 N.W.2d 530, 531 (1974) (quoting *California v. Miller,* 2 Cal.2d 527, 42 P.2d 308, 310 (1935)); *see also Michigan v. Burton,* 252 Mich.App. 130, 651 N.W.2d 143, 150 (2002).

■ With this framework in mind, we now proceed to determine whether Collier's conduct was sufficient to constitute a substantial step toward the commission of murder. Model Penal Code § 5.01(2) includes an illustrative list of conduct that, *if strongly corroborative of the actor's criminal purpose,* shall not be held insufficient to constitute a substantial step as a matter of law. Specifically, that subsection provides:

> Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:
>
> (a) lying in wait, searching for or following the contemplated victim of the crime;
>
> (b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for the commission of the crime;
>
> (c) reconnoitering the place contemplated for the commission of the crime;
>
> (d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

test." *Wisconsin v. Stewart,* 143 Wis.2d 28, 420 N.W.2d 44, 50 (1988) (concluding that test was met in attempted robbery case where "film", if stopped, would have shown the defendant demanding money and appearing to reach for a gun).

8. An emphasis on the equivocality of a defendant's conduct will be especially important in those cases, unlike this one, in which the defendant has not made any statements, either before or after his conduct.

(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

Model Penal Code § 5.01(2). Though not an exhaustive list of the types of conduct that could constitute a substantial step, the Model Penal Code formulation guides our resolution of this case. Collier's conduct falls into three of the seven Model Penal Code categories, namely, lying in wait, reconnoitering, and possession of materials to be employed in the commission of the crime at or near the place contemplated for its commission. Nevertheless, we cannot say that his conduct was *strongly* corroborative of his stated intent.

First, there is undisputed evidence that when the officers apprehended Collier, he was either passed out or asleep. While we do not reject the possibility that lying in wait or reconnoitering may in some cases be deemed sufficient to constitute a substantial step, this is not such a case. Simply driving to the place contemplated for the commission of crime before allowing oneself to fall into unconsciousness cannot be said to be strongly corroborative of a firm criminal purpose, as is the requirement in Indiana. *See Zickefoose*, 270 Ind. at 623, 388 N.E.2d at 510; *see also Mitchem*, 685 N.E.2d at 676. Rather, such evidence of equivocal behavior supports Collier's claim that he never moved beyond mere preparation.

■ Second, there is undisputed evidence that Collier took an ice pick and a box cutter and drove to Nancy's place of employment, where he waited outside in a position from which he would be able to see Nancy exit. But the corroborative significance of a defendant's possession of the weapons he intends to use in committing a crime must be evaluated in light of the types of weapons he possesses. This is because the level of threat or the apparent danger posed by weapons is inversely proportionate to the distance between the defendant and the alleged victim. *See Richeson v. State*, 704 N.E.2d 1008, 1010 (Ind.1998) ("[W]e think that the distance between perpetrator and victim in many attempted murder cases poses special problems of 'intent ambiguity.' "). Therefore, we must consider the nature and capability for injury of the particular weapon or weapons possessed by the defendant. The defendant's conduct must "be something more than mere preparation, remote from the time and place of the intended crime[.]" LaFave § 11.4(b) at n. 33 (citing *Minnesota v. Dumas*, 118 Minn. 77, 136 N.W. 311, 313 (1912)).

Here, Collier was found in his pickup with a box cutter and an ice pick, but given the distance between he and Nancy at the time of his arrest, those items were virtually useless to Collier in terms of an attempted murder. Inasmuch as a pickup, a box cutter, and an ice pick are potentially harmful, it is nonetheless necessary to make direct, close contact with the intended victim in order to do harm. Compare this to the case of a defendant who parks a truck full of explosives near a building. Though the defendant may be the same physical distance from his intended victim or victims as Collier was from Nancy, the defendant with a truck full of explosives

certainly poses a more imminent and significant danger. Likewise, a defendant with a gun is objectively more dangerous from a few hundred feet away than a defendant with a knife or a vehicle. In other words, depending on all the surrounding circumstances, it would seem that a defendant who has come within a few hundred feet of his intended victim with a gun has taken a more substantial step than has a defendant who has come within a few hundred feet of his intended victim with a knife or a pickup. Under the circumstances of this case, we cannot say that Collier's possession of his pickup, a box cutter, and an ice pick was strongly corroborative of a firm criminal intent.

The undisputed facts demonstrate that Collier's conduct never ceased to be equivocal. *See Martinez,* 220 N.W.2d at 531. He drove to Nancy's place of employment but then fell asleep or passed out. Furthermore, while he possessed the weapons he planned to use in commission of the crime, he never moved close enough to Nancy to make those weapons dangerous, that is, to demonstrate a present intent to use the weapons against her. Because Collier's conduct was not strongly corroborative of a firm criminal purpose, he never took a substantial step toward commission of the crime of murder.

## II. What About *Hampton v. State?*

Both parties discuss in their briefs this Court's decision in *Hampton v. State,* 468 N.E.2d 1077 (Ind.Ct.App.1984). Hampton was convicted of attempted robbery based on the following facts:

> Hampton parked his car near the Pizza Hut next to a busy highway, which would have provided an easy escape route. He hid between bushes and the building, attempting to avoid light from passing cars. When arrested he was found wearing a ski mask, which could be pulled down over his face, and he was armed. He was aware a large amount of cash would be taken by the assistant manager when he departed, and other money would be left in the restaurant. If not for the arrival of the police, Hampton would have been able to rob the assistant manager and anyone else still with him.

*Id.* at 1081. On appeal, Hampton argued that he did not take a "substantial step" toward the commission of robbery because he never entered the Pizza Hut or placed anyone in fear. *Id.* Noting that Hampton interpreted the "substantial step" requirement too narrowly, we held that the facts demonstrated that Hampton took a substantial step toward commission of robbery. *Id.*

The State argues that the facts of *Hampton* are instructive for this case. We first note that the Indiana Supreme Court has said that the facts in *Hampton* are "much flimsier" than in other attempted robbery cases. *Van Cleave,* 674 N.E.2d at 1304. Also, several distinctions make the facts of Collier's case even more flimsy than those in *Hampton.* First, Hampton, though somewhat intoxicated, was awake when police apprehended him, while Collier was either asleep or passed out. Second, Hampton, after his arrest, gave a detective a statement in which he acknowledged he had gone to the Pizza Hut to rob it because he needed money. Collier made no such statement to police. Third, while Hampton actually left his vehicle and positioned himself near the building with a gun, there is no evidence that Collier ever made such physical progress toward murder after arriving at the hospital. Furthermore, the holding in *Hampton* is consistent with our holding because Hampton's conduct strongly corroborated his stated intent. With his weapon in hand, he exited his vehicle, approached the restaurant, hid behind the

bushes next to the building, and stayed awake as he lay in wait. Given these distinctions and our Supreme Court's comments that the facts therein were flimsy, the *Hampton* decision, though it affirmed a conviction, weighs in favor of reversing Collier's conviction.

### Summary and Conclusion

Taken as a whole, the acts that Collier completed before being apprehended did not constitute a substantial step. Collier's conduct never ceased to be equivocal. Because "equivocal acts may well reflect an equivocal purpose," LaFave § 11.4(d), we cannot say that Collier's conduct was "strongly corroborative of the firmness of [his] criminal intent." *See Mitchem*, 685 N.E.2d at 676. Furthermore, a comparison of this case with *Hampton*, the only Indiana case presenting facts substantially similar to the instant case, reveals several important factual distinctions that weigh in favor of reversing Collier's conviction.

We may have reached a different result had Collier been awake and alert, had he begun his approach toward the building, either in his pickup or on foot, or even if he had simply opened the door and taken a step out. But those are not the facts before us. Even still, the State would have us find that Collier's act of driving to the hospital with a box cutter and an ice pick constituted a substantial step. The State may be correct, but it was not a substantial step toward *murder*. Collier concedes that the State's evidence proved

beyond a reasonable doubt that Collier committed the crimes of Invasion of Privacy as a Class A misdemeanor [9] or Criminal Stalking as a Class B, C, or D felony.[10] Unfortunately for the State, Collier was not tried for these crimes. Stated differently, we reverse Collier's conviction not because he did not commit a crime, but because he did not commit the crime with which the prosecutor charged him. As the New York Court of Appeals rightfully remarked nearly eighty years ago:

> The police of the city of New York did excellent work in this case by preventing the commission of a serious crime. It is a great satisfaction to realize that we have such wide-awake guardians of our peace. *Whether or not the steps which the defendant had taken up to the time of his arrest amounted to the commission of a crime, as defined by our law, is, however, another matter.*

*New York v. Rizzo*, 246 N.Y. 334, 158 N.E. 888 (1927) (emphasis added).

We remain cognizant that the question of whether a defendant has taken a substantial step toward the commission of a crime is generally a question of fact to be decided by the trier of fact. *See Washington*, 517 N.E.2d at 79. Here, however, the probative evidence and reasonable inferences drawn from the evidence are insufficient, as a matter of law, to have allowed the jury to find beyond a reasonable doubt that Collier took a substantial step toward

---

9. Ind.Code § 35–46–1–15.1.

10. Ind.Code § 35–45–10–5. " 'Stalk' means a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." Ind.Code § 35–45–10–1. Stalking is generally a Class

D felony, but is elevated to a Class C felony if the defendant stalks the victim *and* makes an explicit or an implicit threat with the intent to place the victim in reasonable fear of sexual battery, seriously bodily injury, or death or violates of certain protective orders. I.C. § 35–45–10–5(b). Stalking is elevated to Class B felony if "the act or acts were committed while the person was armed with a deadly weapon." I.C. § 35–45–10–5(c)(1).

murdering Nancy. *See McHenry,* 820 N.E.2d at 126.

Reversed.

CRONE, J., concurs.

BARNES, J., dissents with separate opinion.

BARNES, Judge, dissenting.

I respectfully dissent. In the majority opinion, Judge Vaidik lucidly frames the question we are faced with here as, "whether evidence that Collier drove to Nancy's place of employment with an ice pick, a box cutter, and binoculars, parked outside the door through which he knew Nancy would exit, then fell asleep or passed out is sufficient to have allowed a reasonable jury to find that Collier had taken a substantial step toward the commission of murder." Op. pp. 344–45. I say yes.

I believe it is most important to put this answer in the context of not only the factual posture of this case, but also its legal posture. These facts were tried to a jury without any serious evidentiary dispute. There is no legal "arm-wrestling" over the instructions that were given or the evidence that was introduced. Neither party argued in its oral presentation to us any serious legal matter other than, are these facts enough to legally sustain an attempted murder conviction?

I agree with the vast majority of the legal principles related in the majority opinion and need not repeat all of them here, except to say that the analysis was thoughtful and erudite. I would emphasize that, in my opinion, the most important principle in this case is, "The determination of what constitutes a substantial step is left to the province of the jury." *Neuhoff v. State,* 708 N.E.2d 889, 893 (Ind. Ct.App.1999). Our criminal attempt law allows "some preventive action by police

and courts to stop the criminal effort at an earlier stage, thereby minimizing the risk of substantive harm without providing immunity for the offender." *Zickefoose v. State,* 270 Ind. 618, 622, 388 N.E.2d 507, 509 (1979).

What constitutes a substantial step towards murder is, as the majority points out, usually litigated when a direct attempt is made to take a life. We all could agree that a shot and a miss, a stabbing or shooting that does not result in death, or similar acts push the attempt "needle" to guilty beyond a reasonable doubt. *See, e.g., Bethel v. State,* 730 N.E.2d 1242 (Ind. 2000); *Harris v. State,* 425 N.E.2d 112 (Ind.1981). This case presents a unique fact pattern unlike those in any reported Indiana case concerning attempted murder.

The majority recognizes and concedes that the severity and gravity of the crime, here attempted murder, "weighs in favor of affirming Collier's conviction." Op. p. 345 (citing *Ward v. State,* 528 N.E.2d 52, 54 (Ind.1988)). They do not affirm, however. Part of the reason for not doing so is because of our supreme court's recognition, in the context of jury instructions, "Attempted murder is a special case, deserving special treatment." *Richeson v. State,* 704 N.E.2d 1008, 1010 (Ind.1998). The flip side of this argument is that attempted murder is the only felony in Indiana for which the punishment is less than what may be imposed for the completed crime. *See* Ind.Code § 35–41–5–1(a). A person convicted of attempted Class A felony child molesting can be sentenced from twenty to fifty years, the same as a person convicted of completed Class A felony child molesting. *See* I.C. §§ 35–50–2–1(a), 35–50–2–4. By contrast, a person convicted of murder can be sentenced in a range of forty-five to sixty-five years, but a person convicted of attempted

murder can only be sentenced in the Class A felony range of twenty to fifty years. *See* I.C. §§ 35–50–2–3, 35–50–2–4. Unlike the majority, I would not extend our supreme court's "special treatment" of attempted murder cases to sufficiency of the evidence questions.[1] There is no reason to treat a defendant convicted of attempted murder differently from a defendant convicted of any other Class A felony attempted crime.

Some guidance from the Model Penal Code, upon which Indiana's attempt law is based, is instructive, as the majority recognizes. I agree with the majority's citation to section 5.01(2) of the Code, which lists several examples of conduct that, if strongly corroborative of the actor's criminal purpose, should be deemed sufficient as a matter of law to constitute a substantial step toward committing a crime. I also agree with the majority that Collier's conduct falls within at least three of those explicit examples: lying in wait for the victim, Nancy; reconnoitering the place contemplated for the commission of the crime, the hospital; and possession of materials to be employed in the commission of the crime, a box cutter and an ice pick, at or near the place contemplated for its commission, the hospital. I disagree, of course, with the majority's conclusion that these factors are not strongly corroborative of Collier's criminal purpose.

The majority is correct when it states, "we must necessarily evaluate any statements a defendant may have made together with his conduct in order to determine whether that which he has done strongly corroborates that which he said he would

do." Op. p. 347. After making this observation, however, I submit that the majority fails to follow it, especially when it discusses the lack of immediate danger presented by Collier's possession of an ice pick and box cutter without mentioning his stated intention to stab Nancy in the heart and cut her throat. Our case law strongly suggests that clear statements of intent can support criminal attempt convictions, even where the conduct at issue is by itself perfectly legal and does not pose an immediate threat of harm to the intended victim.

For example, in *Johnston v. State*, 541 N.E.2d 514 (Ind.1989), the defendant was convicted of three counts of attempted child molesting. The evidence supporting the convictions was that the defendant had told the parents of three children that he wanted to molest them, and then went to the parents' house with sexual devices, lubricants, and sedatives to give to the children; there was no evidence that the parents ever actually intended to allow the defendant to molest their children. Our supreme court affirmed, finding sufficient evidence of the defendant's intent to molest the three children and that he had taken a substantial step towards committing the crimes. The court observed,

> Appellant clearly stated his intentions to the parents of the children. The fact that he approached the parents with a bag of paraphernalia which he stated he intended to use in his molestation of the children and the fact that he gave the parents specific instructions as to how the children were to be prepared for the

---

**1.** Additionally, the degree to which a defendant has taken a "substantial step" toward committing attempted murder is something that a trial court may take into consideration in determining the defendant's sentence because it reflects the "nature and circumstances of the crime" under Indiana Code Section 35–38–1–7.1(a) and something that appellate courts may take into consideration in determining whether a sentence is "inappropriate" because it reflects the "nature of the offense" under Indiana Appellate Rule 7(B).

molestation is evidence which supports the verdict of the jury.

*Id.* at 517. Our supreme court believed it was necessary and proper to consider what the defendant had done in conjunction with his stated intentions prior to performing those acts. The fact that the defendant's actions by themselves were not illegal and posed no actual imminent threat to the children was not enough for the defendant to escape criminal liability for attempted child molesting.

Likewise, here I conclude that Collier's actions are strongly corroborative of his intent as revealed in his statements to Cameron. Those statements included, immediately before going to the hospital, that he was going to kill Nancy "tonight" by stabbing her in the heart and cutting her throat, and giving instructions to Cameron as to how to take care of the family pets. Collier's conduct included collecting a box cutter, ice pick, and a pair of binoculars, and driving to the hospital and parking in an area where he could see the only exit persons leaving the hospital could use at the time Nancy was expected to leave. I agree that in isolation possessing a box cutter, ice pick, and pair of binoculars might appear "innocent" and not much of a threat, but not when combined with Collier's stated intention to kill Nancy by cutting and stabbing her and Collier's having parked across the street from the hospital exit while there was a protective order in effect requiring Collier to stay away from the hospital. Additionally, although ice picks and box cutters have legitimate uses other than as weapons, under these circumstances there is no indication that Collier had any legitimate reason for possessing the box cutter and ice pick, such as

that he intended to open cardboard boxes or go ice fishing. This is especially true in light of the evidence that Collier did not usually have these items in his truck, but specifically collected them and placed them in his truck before driving to the hospital.

I also disagree that because Collier was passed out asleep when police arrived that his conduct before passing out should be disqualified as strongly corroborative of his criminal intent. Was he dozing until he knew Nancy was scheduled to get off work? Did his ingestion of alcohol overtake him? [2] Does it legally make any difference? What if police, properly warned, had interrupted Collier as he drove into the parking lot? Would Collier be more or less culpable if he were awake? We cannot answer these questions with certainty, but, to me, they are legally of little consequence. The law "focuses on the substantial step that the defendant has completed, not on what was left undone." *Zickefoose,* 270 Ind. at 623, 388 N.E.2d at 510. Also, "It is not necessary that there be a present ability to complete the crime ...." *Id.* Obviously, Collier could not have completed the crime while asleep in his truck, but I submit that is of no moment in analyzing whether he took a substantial step toward murdering Nancy.

I also am not persuaded by the majority's attempt to distinguish or discredit *Hampton v. State,* 468 N.E.2d 1077 (Ind. Ct.App.1984), a case where a would-be robber waited outside a restaurant while armed and wearing a ski mask but never actually entered the restaurant. First, although our supreme court later did describe the facts in *Hampton* as "flimsy," it in no way indicated that the case was incorrectly decided but instead cited it

---

**2.** Collier does not claim he was involuntarily intoxicated, and voluntary intoxication is no longer a defense in Indiana to a criminal charge. *See Sanchez v. State,* 749 N.E.2d 509,

517 (Ind.2001). He also does not argue that he voluntarily abandoned any effort to commit a crime. *See* I.C. § 35–41–3–10.

with apparent approval as support for affirming the conviction before it. *See State v. Van Cleave*, 674 N.E.2d 1293, 1304 (Ind. 1996). Second, as I have discussed, I believe the fact that Collier was asleep in his truck is of no legal significance. Third, although Collier made no post-arrest confession to the police, he did make pre-arrest statements to Cameron clearly delineating his intent. Finally, the fact that Collier made no physical progress toward murder after arriving at the hospital is not significant because it is reasonable to infer from where Collier parked and his possession of binoculars that he intended to wait until Nancy left the hospital before attacking her. Therefore, I strongly disagree with the majority that *Hampton* "weighs in favor of reversing Collier's conviction." Op. p. 350. I believe the opposite is true.

I appreciate that the conduct by Collier could have been charged, as the majority suggests, as stalking or invasion of privacy. However, the prosecutorial decision was to charge attempted murder only and to try to prove that charge to a jury. That decision resulted in a guilty verdict. Where a defendant's conduct arguably violates more than one criminal statute, the prosecutor has the discretion to decide whether to prosecute and under what statute or statutes to file charges. *Lampitok v. State*, 817 N.E.2d 630, 636 (Ind.Ct.App. 2004), *trans. denied.*

Were I the prosecutor in Steuben County, I might have exercised my discretion differently when charging Collier. I am not. Additionally, had I been a juror in this case, it is possible I could have been persuaded to vote for Collier's acquittal of attempted murder. I was not. The bottom line is that this jury, on these facts, returned a guilty verdict. To conclude otherwise amounts to infringing on this prosecutor's charging discretion and this jury's exclusive prerogative to weigh the evidence. This is a close case, and my dissent should not be taken to mean that in another case, with different facts and legal issues, that I necessarily would vote to sustain an attempted murder conviction. I do so here.