

**FILED**
Aug 09 2017, 5:17 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| B.T.E.,<br>*Appellant-Respondent,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Petitioner.* | August 9, 2017<br><br>Court of Appeals Case No.<br>36A05-1607-JV-1702<br><br>Appeal from the Jackson Superior Court<br><br>The Honorable Bruce A. MacTavish, Judge<br><br>Trial Court Cause No.<br>36D02-1601-JD-3 |

**Brown, Judge.**

[1] B.T.E. appeals the juvenile court's true finding that he committed delinquent acts which, if committed by an adult, would constitute attempted aggravated battery and conspiracy to commit aggravated battery as level 3 felonies. B.T.E. raises four issues which we revise and restate as:

I. Whether the court erred in denying B.T.E.'s motion to dismiss based upon Ind. Code § 31-37-11-2; and

II. Whether the evidence is sufficient to support the juvenile court's true findings that B.T.E. committed the delinquent acts which, if committed by an adult, would constitute attempted aggravated battery and conspiracy to commit aggravated battery as level 3 felonies.

We affirm in part and reverse in part.

### Facts and Procedural History

[2] In the Fall of 2015, Seymour High School students B.T.E. and M.V. began planning to attack the school on April 20, 2018, and to specifically target two other students at the school, J.R. and G.M. The date of April 20, 2018 was chosen because it was the "anniversary of the Columbine School Massacre." Transcript Volume 3 at 21. B.T.E. and M.V. frequently communicated about the subject using Facebook, and B.T.E. specifically asked M.V. to help him carry out the plan. B.T.E. drew a diagram of one of his classrooms, shading two students' seats and drawing an "X" over J.R.'s seat. *Id.* at 22-23. He also drew a diagram of one of the buildings at the school and marked names of teachers and doors to the classrooms.

[3]     Among the messages exchanged with M.V. on October 31, 2015 B.T.E wrote:
"I hate [J.R.]. I hope he gets f----- killed. The things I'd do to him. They would
make even the sociopathic of sociopaths shake and stutter. I hope he f----- dies
a slow and painful death that lasts for days." *Id.* at 33. On November 4, 2015,
B.T.E. wrote to M.V.: "[J.R.] got a (-1) with [G.M.] because he was [E.'s]
partner instead of hers. It shows that he should have a crush on [E.] and not
[G.M.] of [sic] I'll kill him. I will. If he dates [G.M.] then I will seriously kill
him. Then she will hate me so I'll kill her too." State's Exhibit 10; Transcript
Volume 3 at 36. That same day, B.T.E. and M.V. wrote the following on
Facebook:

> M.V.: If you are going to do a murder. One, wear clothes you
> never would wear again and haven't worn much before. Wear
> shoes that aren't yours, or have little to no traction left on the
> bottom. And make it look like you were looking for something
> on them so it appears to be a robbery over a specific item that
> you would never need.
>
> That way it is harder to identify you and tie you down as a
> suspect.
>
> How well you hide your tracks determine [sic] the rest
>
> By identify, I mean in case someone sees you near the scene
>
> B.T.E.: I don't need a lesson on s--- I've already studied
>
> M.V.: I'm proving to you that I know my way around too -.-

State's Exhibit 31; Transcript Volume 3 at 64.

[4] On November 11, 2015, B.T.E. wrote: "I want to 'get a bowl cut' and become famous after I'm arrested[.] Then go to jail[.] I will be home there[.] The whole f------ worlds out to get me[.] 'Ha look he's mad[.]' Me: Ha look he's scared cause I killed his mom[.] Now I'm f------ talking." State's Exhibit 26; Transcript Volume 3 at 56.

[5] On November 12, 2015, B.T.E. and M.V. communicated on Facebook as follows:

> B.T.E.: Me and faggot f--- have a mutual thing going on
>
> He wants to get lots of sleep
>
> I want him to get nonstop sleep
>
> I'm pissed
>
> I hate that f---
>
> M.V.: What do you think the most painful death would be?
>
> B.T.E.: Let's test everything in [J.R.] as we can
>
> M.V. I was thinking that
>
> As many cuts as possible
>
> Without severing any important organs or blood vessles [sic]

B.T.E.: Implement through the ass and out the mouth

Sometimes

Scratch that

You last between a few hours and a few days

M.V.: Vlad the impaler proved this

State's Exhibit 29; Transcript Volume 3 at 62-63.

[6] On November 13, 2015, B.T.E. and M.V. communicated on Facebook as follows:

B.T.E.: I got pissed many times today

Three or four times because of [J.R.]

Hate that c---

Too bad I don't have a benevolent mind, or [J.R.] would make it past highschool [sic]

I'm serious

I'm taking him out with me

That f----- c---

I got pissed off when I was in math and I called [J.R.] a (this was to my friends obviously) 'Horton hears a who-lookin [sic] mother------' and said that I hated his f----- soul and such I'll kill him[.]

M.V.: They thought it was funny

B.T.E.: I think [G.M.] heard me mention [J.R.]

Good

I'll kill him

State's Exhibit 18; Transcript Volume 3 at 43-44.

[7] On November 18, 2015, B.T.E. and M.V. had the following conversation on Facebook:

B.T.E.: Kill [J.R.]

* * * * *

B.T.E.: I could steal a knife from POE and kill [J.R.] with it and then take out as many people as possible

M.V.: Or you could buy a gun

B.T.E.: Or

I could attempt to break into my dads gun safe so I wouldn't have to buy a weapon

M.V.: Speaking of guns

Next weekend

I am going hunting

B.T.E: I've never been

M.V.: I'm going to be killing birds

B.T.E.: I'm going to be killing [J.R.]

State's Exhibit 30; Transcript Volume 3 at 63.

[8] On December 2, 2015, B.T.E. wrote to another person on Facebook: "I think I figured out how to make pipe bombs when I was researching school shootings influenced by columbine." State's Exhibit 27; Transcript Volume 3 at 56. That same day, he sent on Facebook to M.V. detailed instructions for how to make a pipe bomb and noted: "That's only the important stuff." State's Exhibit 28; Transcript Volume 3 at 58. On December 7, 2015, B.T.E. wrote on Facebook to M.V.: "4/20/18[.] Some people will find out what the state of nothingness is like :)." State's Exhibit 32. Then, on December 9, 2015, B.T.E. and M.V. corresponded on Facebook as follows:

B.T.E.: *gunfire* you better hope I don't f------ miss

 *hits [J.R.] behind you*

M.V.: You fat f---

B.T.E.: *pits [sic] three more shots into [J.R.'s] head before turning and shooting past you into the classroom on your left hitting [G.M.] in the forehead

M.V.: Well, nice shooting, Texas

State's Exhibit 33; Transcript Volume 3 at 66.

[9] On January 13, 2016, M.V. made a threat against the school to another student, B.C., who reported that threat to the school counselor. As a result of the report, the school and the Seymour Police Department began an investigation, and Officer Brian Williams, who was assigned as the School Resource Officer for the Seymour Community School Corporation, examined B.T.E.'s Facebook page and observed that he had posted a picture "of the joker character [] and it resembled the character from the current Batman movie which was portrayed as a, a psychopathic serial killer," and that within his Facebook "likes section" he liked "a page called Columbine High School Massacre." Transcript Volume 2 at 22.

[10] On January 15, 2016, Detective Crystal Schapson interviewed B.T.E., and when asked about the allegations against him B.T.E. "immediately began advising that it was just a joke, he started to become visibly upset kind of teary eyed." Transcript Volume 3 at 6. B.T.E. stated that "he had talked with other students about possible [sic] shooting up the school," as well as "his hatred for some students." *Id.* B.T.E. explained that "there was one student in particular that he, he liked, had a crush on, and that she was talking to or dating []

another student and that angered him and he felt like it was a competition between that male student and himself," and that the male student was J.R. and the female student was G.M. *Id.* at 8. When J.R. was discussed, B.T.E., who had been "teary eyed, kind of emotional . . . immediately stopped crying, he sat up, he became very stiff, very rigid, [] at times had his hands on the desk and was clinching [sic] his fist while talking about it." *Id.* B.T.E. stated that he came up with the date of April 20, 2018, himself "because that was the anniversary of the Columbine School Massacre" and would be his and M.V.'s senior year of high school, just as it was for the perpetrators of the Columbine shooting. *Id.* at 21. B.T.E. also referred to the discussions as "just a repetitious joke." *Id.* Detective Schapson also asked B.T.E. about the drawings of the classroom and the school building that had been discovered, and he "hesitated in answering [the] question, actually repeated [the] question back to [Detective Schapson], which he had not done throughout the entire interview" previously. *Id.* at 22. He indicated that he did not know what he wanted to do after high school and contemplated wanting "to be in architecture so he started drawing buildings . . . ." *Id.*

[11] On January 19, 2016, B.T.E. was arrested. On January 26, 2016, the State alleged B.T.E. to be a delinquent child for attempted murder, an act which would be a level 1 felony if committed by an adult, and attempted aggravated battery, an act which would be a level 3 felony if committed by an adult. The court approved the filing of the delinquency petition the same day. In March 2016, the State filed amended delinquency petitions alleging B.T.E. to be

delinquent for committing the acts which would be the following if committed by an adult: conspiracy to commit murder as a level 2 felony; conspiracy to commit aggravated battery as a level 3 felony; conspiracy to possess a firearm on school property as a level 6 felony; and attempted dangerous possession of a firearm as a class A misdemeanor. On March 28, 2016, the court ordered B.T.E. released to home detention.

[12] The court commenced a fact-finding hearing on April 27, 2016, and after hearing testimony from three witnesses the State moved to continue the hearing "on the issue of admission of Facebook records as business records," which was continued over B.T.E.'s objection. On May 5, 2016, B.T.E. filed a motion to dismiss pursuant to Ind. Code § 31-37-11-2(1)(b) and filed an amended motion to dismiss on May 9, 2016. The court denied B.T.E.'s amended motion to dismiss on May 16, 2016.

[13] The hearing resumed on May 24, 2016. At the hearing, the court conditionally admitted the statements of M.V. in Exhibits 29, 30, 31, 34 over B.T.E.'s hearsay objections. The State also offered the Facebook message exchanges between B.T.E. and another individual, D.H. The first exchange occurred on November 22, 2015, and is as follows:

D.H.: who's she dating?

me

B.T.E.: My buddy J------

D.H.: show me him.

* * * * *

D.H.: so I can kill him

B.T.E.: Yes

While you're at it

Kill that mucus-snorting queer[1]

State's Exhibit 23; Transcript Volume 3 49-50, 52. Also, an exchange between B.T.E. and D.H. dated November 30, 2015, took place as follows:

D.H.: I'm so close to killing myself

B.T.E: No no kill someone else not yourself

Come to Seymour and kill that f----- and then kill yourself

* * * * *

D.H.: I'm gonna kms

* * * * *

---

[1] At this point in the Facebook conversation, B.T.E. inserts a picture of J.R.

B.T.E.:  Oh

Whisper*

Don't do that

Kill others before yourself

State's Exhibit 24; Transcript Volume 3 at 53.  B.T.E. objected to the admission of Exhibits 23 and 24 on the bases of hearsay and relevancy, arguing regarding relevancy that the exhibits have "got nothing to do with, with the conspiracy that is alleged between [B.T.E.] and [M.V.]."  Transcript Volume 3 at 50.  The court admitted the exhibits as to the attempt charges but sustained the objection as to the conspiracy charges.

[14]  On June 3, 2016, the court entered true findings for conspiracy to commit aggravated battery and attempted aggravated battery, both level 3 felonies if committed by an adult, and not true findings for the other charges.  In its order, the court found that the State proved the charge of conspiracy to commit aggravated battery by independent evidence and admitted Exhibits 29, 30, 31, and 34 as evidence.  On June 28, 2016, the court sentenced B.T.E. to probation until his 18th birthday, with a suspended commitment to the Indiana Department of Correction.

## Discussion

### I.

The first issue is whether the court erred in denying B.T.E.'s motion to dismiss based upon Ind. Code § 31-37-11-2. B.T.E. argues that the delinquency petition was filed on January 26, 2016, that the State requested an early trial because B.T.E. was in detention, that more than sixty days after the filing, on March 28, 2016, the court placed B.T.E. on home detention, that on April 27, 2016, more than ninety days after the filing, the fact-finding hearing commenced but ultimately was continued at the State's request and over B.T.E.'s objection "because [the State] had not properly certified business records it intended to admit," that he filed an objection to the trial setting on that date, and that on May 5, 2016, he filed a motion to dismiss arguing that the State had failed to bring him to hearing in a timely manner. Appellant's Brief at 24. He further notes that, on May 24, 2016, the court reconvened and took the matter under advisement nearly 120 days after the petition had been filed. B.T.E. notes that this Court has previously held that Ind. Code § 31-37-11-2 does not mandate dismissal when the deadline is not met, but he "respectfully requests the Court reconsider the logic of not holding the State accountable to the mandatory deadline . . . ." *Id.* at 25. He also maintains that, although he did not object to the original setting of the fact-finding hearing on April 27, 2016 as outside the sixty-day time period, he did object to setting the second Fact Finding Hearing on May 24, 2016 on that basis.

The State argues that B.T.E. waived this issue when he failed to object after the court scheduled the hearing outside of the sixty-day time frame. It asserts that B.T.E. "did not move to dismiss until the fact-finding hearing had already

commenced and several witnesses had been examined before the hearing was continued by the juvenile court." Appellee's Brief at 40-41. The State further argues that, waiver notwithstanding, this court has held that the legislature has not provided for a remedy of discharge for a violation of Ind. Code § 31-37-11-2. The State maintains that "[j]udicially creating a discharge remedy would be inconsistent with the purposes and policies behind the juvenile justice system," which is "intended to 'ensure that children . . . are treated as persons in need of care, protection, treatment, and rehabilitation' and to 'provide a juvenile justice system that protects the public by enforcing the legal obligations that children have to society and that society has to children.'" *Id.* at 43 (quoting Ind. Code §§ 31-10-2-1(5), -1(8)). It argues that "[t]his purpose of providing rehabilitation and treatment to a child headed down the wrong path in life is not served if the juvenile is discharged before a delinquency petition can be adjudicated and rehabilitative measures imposed upon the child." *Id.* at 44.

[17] This Court recently addressed this issue in *K.G. v. State*, 67 N.E.3d 1147 (Ind. Ct. App. 2017), *trans. denied*. In *K.G.*, the juvenile court granted multiple continuances, each over the objection of K.G., and the fact-finding hearing was ultimately held outside of the sixty-day time period. 67 N.E.3d at 1148. On appeal, K.G. argued "that he was entitled to dismissal because the fact-finding hearing was held beyond the time limits set forth in I.C. § 31-37-11-2(b)." *Id.* We began our analysis by observing that Section 2 provides as follows:

> (a) If:

> > (1) a child is in detention; and
>
> > (2) a petition has been filed;
>
> a fact-finding hearing or a waiver hearing must be commenced not later than twenty (20) days, excluding Saturdays, Sundays, and legal holidays, after the petition is filed.
>
> (b)  If:
>
> > (1) a child is not in detention; and
>
> > (2) a petition has been filed;
>
> the hearing must be commenced not later than sixty (60) days, excluding Saturdays, Sundays, and legal holidays, after the petition is filed.
>
> (c)  A child who is ordered detained in the home of the child's parent . . . may not be considered as being detained for purposes of this section.

*Id.* at 1148-1149.

[18]     We noted that this Court has rejected this argument "on at least two occasions." *Id.* at 1149 (citing *A.K. v. State*, 915 N.E.2d 554, 556 (Ind. Ct. App. 2009) ("the juvenile code does not mandate dismissal of the charges when the sixty-day deadline is not met"), *reh'g denied*, *trans. denied*; *J.D. v. State*, 909 N.E.2d 1035, 1037-1038 (Ind. Ct. App. 2009) ("[w]ithout clear statutory authorization, we cannot say that a violation of the sixty-day limit of Section

2(b) required the trial court to dismiss the allegations")). We further noted that "a review of chapter 31-37-11 reveals that continuances beyond the general sixty-day limit are clearly contemplated" and specifically observed that Ind. Code § 31-37-11-9(b) contains "the only section of chapter 31-37-11 that expressly calls for discharge when a specific time limit is violated" which neither party claimed was applicable in that case.[2] *Id.* We held that "[a]lthough Section 2 uses 'must' regarding the time limits for holding the hearing, we conclude that the term is intended to be directory rather than mandatory in this context" and "decline[d] the invitation to read a discharge remedy into Section 2(b) that the legislature did not mandate, especially where the legislature specified precise remedies in other parts of the chapter." *Id.* at 1149-1150.

[19]  We find that the holding in *K.G.* applies with equal force here. In fact, although the child in *K.G.* timely objected and requested discharge on multiple occasions, here B.T.E. did not object until April 27, 2016, and did not file his motion to dismiss until May 5, 2016, both well past the sixty-day time period. We cannot say that the court erred in denying B.T.E.'s motion to dismiss.

---

[2] Ind. Code § 31-37-11-9(b) provides that the court "shall discharge the child" if the fact-finding hearing is "not commenced within the ninety (90) day period required by this section . . . ." Ind. Code § 31-37-11-9(a) provides that the court may continue the hearing for not more than ninety days when a motion for continuance is made under Ind. Code § 31-37-11-8, which allows the prosecuting attorney to move for a continuance of the fact-finding hearing or waiver hearing "because of the absence of a witness" after the "child moves for discharge . . . ." B.T.E. does not argue that Section 9(b) is applicable in this case. Further, we cannot say that it is applicable given that B.T.E. moved to dismiss the petition on May 5, 2016, based upon Ind. Code § 31-37-11-2(1)(b) and that the court held the final fact-finding hearing on May 24, 2016.

[20] The next issue is whether the evidence is sufficient to support the juvenile court's true findings that B.T.E. committed delinquent acts which, if committed by an adult, would constitute attempted aggravated battery and conspiracy to commit aggravated battery as level 3 felonies. When the State seeks to have a juvenile adjudicated to be a delinquent for committing an act which would be a crime if committed by an adult, the State must prove every element of the crime beyond a reasonable doubt. *J.R.T. v. State*, 783 N.E.2d 300, 302 (Ind. Ct. App. 2003), *trans. denied*. Upon review of a juvenile adjudication, this court will consider only the evidence and reasonable inferences supporting the judgment. *Id.* We will neither reweigh the evidence nor judge witness credibility. *Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt, we will affirm the adjudication. *Id.*

A. *Attempted Aggravated Battery*

[21] Ind. Code § 35-42-2-1.5 provides in part that "[a] person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death or causes: (1) serious permanent disfigurement; (2) protracted loss or impairment of the function of a bodily member or organ . . . commits aggravated battery, a Level 3 felony." Ind. Code § 35-41-5-1 provides that a person attempts to commit a crime when, acting with the culpability required for commission of

the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime.

[22] B.T.E. argues that in order to convict a person of an attempt crime, proof of the "substantial step" element must go "beyond mere preparation and in furtherance of the intent to commit the crime . . . ." Appellant's Brief at 15. He argues that the court "expressly based its determination that [he] had committed attempted aggravated battery on the notion that [he] had engaged in a substantial step by '. . . preparation and planning of the aggravated battery of J.R. . . .'" which "[o]n its face . . . demonstrates the insufficiency of the record to support an attempted aggravated battery finding." *Id.* at 16. He asserts that the specific actions found by the trial court "fall far short of the limit set by this Court on the reach of 'attempt crimes.'" *Id.*

[23] Specifically, B.T.E. argues that the drawings of the seating chart and school building are not linked to any actual step toward committing a crime and "represent, at best, the beginnings of a plan." *Id.* at 17. He asserts regarding weapons that the court found he "*planned* to get a gun, *planned* to conceal the crime, and *researched* a pipe bomb," but "all fall short of taking any step beyond mere 'planning and preparation,'" further noting the statements contained in the Facebook Messages "are not actually 'planning' statements at all" and instead "speak of possibilities and contingencies." *Id.* Finally, B.T.E. maintains that the "alleged solicitation of D.H. to assist in the crime" does not constitute a substantial step and the State's argument to the contrary is based upon "a gross misreading" of *Ward v. State*, 528 N.E.2d 52 (Ind. 1988), because

such statements cannot "be considered immediate" and "cooperation or submission of D.H. is by no means an essential feature of the substantive crime." *Id.* at 17-19.

The State argues that B.T.E. committed a substantial step toward commission of the charged crime by creating diagrams and drawings of the classroom and school, researching how to make a pipe bomb and sending his findings to M.V., asking M.V. to help him commit the crime, and asking "D.H. to come to Seymour and kill J.R[.]" Appellee's Brief at 29. It asserts that B.T.E.'s communications to D.H. "cannot be construed as anything other than 'the form of urging' and the 'solicitation urges the commission of the crime at some immediate time and not in the future.'" *Id.* at 30 (quoting *Ward v. State*, 528 N.E.2d 52, 54 (Ind. 1988)). It contends that B.T.E.'s arguments are merely requests to reweigh evidence, that B.T.E. challenges the admission of certain evidence in his argument regarding sufficiency of the evidence which is not proper, and that in reviewing sufficiency claims "this Court looks at all of the evidence, regardless of claims that some evidence should not have been admitted." *Id.* at 31.

"The substantial step element of attempt requires proof of any overt act beyond mere preparation and in furtherance of the intent to commit the crime." *Calvert v. State*, 930 N.E.2d 633, 639 (Ind. Ct. App. 2010) (quoting *Jackson v. State*, 683 N.E.2d 560, 566 (Ind. 1997)). "This requirement has been described as a minimal one,[] *State v. Van Cleave*, 674 N.E.2d 1293, 1304 (Ind. 1996), *reh'g denied*, but the conduct must strongly corroborate the defendant's criminal

intent." *Id.* (quoting *Jackson*, 683 N.E.2d at 566). A reviewing court's analysis "focuses on what has occurred and not what remains to be done." *Id.* (quoting *Jackson*, 683 N.E.2d at 566). Whether a defendant's actions constitute a substantial step is generally a question for the trier of fact based on the totality of circumstances, and it "is impossible to lay down any general rule to determine what acts are too remote to constitute an attempt." *Id.* (quoting *Collier v. State*, 846 N.E.2d 340, 344, 345-346 (Ind. Ct. App. 2006) (quotation omitted), *trans. denied*). Nonetheless, in some cases the defendant's conduct will fall short of a substantial step as a matter of law. *Id.*

[26] In *Calvert*, defendant Calvert was driving a Jeep with three passengers including J.F., in which J.F. told Calvert after being picked up "that he was going to rob a liquor store by running in, demanding money, and running back out." *Id.* at 637. Officer Staples observed Calvert turn the Jeep into the south side parking lot of the House of Spirits liquor store and took notice "because he had been assigned to specially patrol the city's liquor stores, the police department having been informed by another law enforcement agency that there were heightened grounds to suspect liquor store robberies." *Id.* Officer Staples "observed the Jeep circle the liquor store by turning into an alley behind the store, driving back to the north side parking lot, and finally turning north on State Road 7, and he "then drove his police car out of the parking lot of American Rental, a business closed at the time and on the opposite side of the road from the liquor store, and turned to follow the Jeep." *Id.* Calvert turned the Jeep into the American Rental parking lot, and Officer Staples parked behind him, stepped

out, and spoke briefly with Calvert, who told Officer Staples "he was 'just hanging out.'" *Id.* Other officers arrived, and the Jeep's occupants were ordered from the vehicle. *Id.* With the doors open, another officer observed a sawed-off shotgun lying on the floor in plain view, as well as what looked like a handgun, but was actually a BB pistol on the back seat and an orange ski mask. *Id.* "Subsequent searches of the Jeep uncovered another BB pistol, three pairs of sunglasses, and two more orange ski masks." *Id.* At a police interview, Calvert stated that "at the time Officer Staples stopped behind the Jeep, he was getting ready to drop J.F. and Cole off at American Rental but had 'no clue' what they were going to do there." *Id.* at 637-638. He also stated that J.F. stole the two pistols from Wal-Mart and had bought the shotgun. *Id.* at 638. He was charged with and convicted on three counts including a count of attempted robbery. *Id.*

[27] On appeal, we discussed the law of what might constitute a substantial step as follows:

> In *Collier*, this court held the defendant's actions did not constitute a substantial step toward the murder of his estranged wife. Three times on the day of the incident, Collier told a neighbor that he was going to kill his wife and himself. Later that night, he drove to his wife's workplace while she was there, had in his car an ice pick and a box cutter, and parked in a lot with a view of the building's only after-hours exit. However, when police officers later found Collier inside his car, he was asleep or passed out. This court reasoned that despite Collier's lying in wait, reconnoitering, and possessing materials to be used in the crime, his conduct as a whole was not "*strongly* corroborative of his stated intent," *id.* at 348 (emphasis original),

because he thereafter ceased to be awake or alert and never came close enough to his wife to place her in imminent physical danger, *id.* at 349-50. In *Hampton v. State*, 468 N.E.2d 1077 (Ind. Ct. App. 1984), this court affirmed a conviction for attempted robbery of a restaurant. The defendant parked his car next to a busy highway, a potential easy escape route; he walked up to the restaurant and hid between bushes and the restaurant building in an effort to avoid car lights; and when found by police he was lying face down between bushes and the building, carrying a pistol and wearing a ski mask. Additionally, the defendant was a former employee of the restaurant, admitted his plan to rob that restaurant, and knew its assistant manager would be departing that night with a large amount of cash. *Id.* at 1079, 1081.

*Id.* at 639. We held that "Calvert's actions, including as an accomplice through J.F., were at most mere preparation to rob the liquor store," noting that "as *Collier* illustrates, merely driving to a location contemplated for a crime while possessing materials for use in the crime is not necessarily sufficient for a substantial step." *Id.* at 640.

[28] The amended petition alleged the following for attempted aggravated battery:

> The undersigned says that between October 31, 2015 and January 15, 2016 . . . [B.T.E.] did knowingly or intentionally attempt to inflict injury on J.R. that created a substantial risk of death, to wit: developed plans for a school shooting at Seymour High School, composed a map of a classroom seating chart with J.R.'s seat targeted, developed plan's [sic] to break into his parent's gun safe, developed plans to stab and torture J.R. prior to killing him, discussed how to conceal murder evidence, and/or made plans to obtain other weapons which conduct constituted a substantial step toward the commission of said crime of Aggravated Battery . . . .

Appellant's Appendix at 127-128. Additionally, the court in its Order on Fact Finding Hearing entered on May 24, 2016, stated the following in finding that B.T.E. committed an act that would constitute attempted aggravated battery if committed by an adult:

> The court finds that the State of Indiana has proven beyond a reasonable doubt the material element of Attempted Aggravated Battery under I.C. 35-41-2-1.5 and 35-41-5-1 at the Fact Finding hearing, a Level 3 Felony. The Court finds that [B.T.E.] did knowingly or intentially [sic] engage in conduct with intent to commit aggravated battery against J.R. that [B.T.E.] did commit preparation and planning of the aggravated battery of J.R. through the following acts:
>
> > a. Drawing of a diagram for the seating chart for Mrs. Buchanan's class with J.R.'s seat marked, State's Exhibit 4.
> >
> > b. Drawing a map of the 300 building of Seymour High School, State's Exhibit 5.
> >
> > c. [B.T.E.] engaged conversations and plans to commit aggravated battery of J.R. in a series of multiple messages on Facebook between October 31, 2015 and January 16, 2016 with [M.V.], planned to break into his parents' gun cabinet to obtain a gun, and planned to conceal the crime and evidence. [B.T.E.] also researched building a pipe bomb and sent research to [M.V.] on Facebook. State's Exhibit 6-19 and 25-34.
> >
> > d. [B.T.E.] also committed the substantial step toward the crime of attempted aggravated battery by soliciting assistance from D.H. to commit the offense of aggravated

> battery against J.R. in messages on Facebook, State's
> Exhibits 21-24.

*Id.* at 178-179.

[29] We agree with B.T.E. that the conduct alleged to constitute a substantial step did not go beyond mere preparation and was not strongly corroborative of his stated intent. Indeed, B.T.E.'s conduct as a whole falls far short of even that alleged in *Collier* where, again, we found the evidence of a substantial step lacking. We do not believe that drawing a diagram of a seating chart or the 300 building at the school to "be strongly corroborative of the firmness of the defendant's criminal intent," especially given the proposed date of the attack of April 20, 2018. *Collier*, 846 N.E.2d at 344. We find these acts to be, at best, preparation for some criminal act in the future. We similarly are not persuaded that any of the alleged acts contained in part (c) of the court's order constitute a substantial step. As the court notes in its order, most of these "acts" are nothing more than speaking over Facebook with M.V. about actions they might take in order to prepare for an attack. Even B.T.E.'s act of researching how to build a pipe bomb is nothing more than mere preparation, for there is no evidence that he made any effort toward obtaining any of the ingredients to build a pipe bomb.

[30] Finally, to the extent that the court based its true finding on messages exchanged between B.T.E. and D.H. and specifically B.T.E.'s solicitation of D.H. to commit the crime, we find that the court misapplied the law of solicitation as attempt. In *Ward*, the Indiana Supreme Court adopted "two

separate tests to determine when solicitation may be a substantial step," noting that "[t]he first test is fairly mechanical and the second involves an assessment of the wrong which the legislature seeks to sanction." 528 N.E.2d at 54. The tests are as follows:

> *Three-Part Test for Solicitation.* First, a solicitation may be a substantial step only when: 1) the solicitation takes the form of urging; 2) the solicitation urges the commission of the crime at some immediate time and not in the future; and 3) the cooperation or submission of the person being solicited is an essential feature of the substantive crime.[3]

> *Nature of the Crime.* Second, if those findings are made, the court must consider the specific crime, and the wrongful human conduct that the legislature sought to sanction. One commentator has stated an eloquent principle about the role which the nature of the crime plays in determining what a substantial step is: ". . . the more serious the crime attempted or the greater the menace to the social security from similar efforts on the part of the defendant or others, the further back in the series of acts leading up to the consummated crime should the criminal law reach in holding the defendant guilty for attempt."

*Id.* (internal citations omitted).

[31] There are a number of reasons why B.T.E.'s messages to D.H. do not constitute a substantial step under the tests articulated in *Ward.* B.T.E.'s urging was not

---

[3] This specific evaluation of the solicitation, therefore, excludes three-party solicitations, where A solicits B to murder C. It does include, though, two-party solicitations such as bribery or suborning perjury.

for D.H. to immediately commit the crime – it was, at best, to do so at some point in the future. In *Ward*, the crime at issue was attempted child molesting, in which defendant Ward urged two different children to allow him to perform fellatio on them. *Id.* at 53. Here, by contrast, there is no discussion of when D.H. should commit the crime of aggravated battery, and indeed there is no specifics of how to do so or weapons that might be used.

[32] More importantly, the three-part test requires that "the cooperation or submission of the person being solicited is an essential feature of the substantive crime." As argued by B.T.E., D.H.'s cooperation is not an essential feature of the crime of aggravated battery. The footnote immediately following the test underscores how this conduct is not a substantial step where it explains that the test "excludes three-party solicitations, where A solicits B to murder C." *Id.* at 54 n.3. That precisely describes the messages at issue, in which A is B.T.E., B is D.H., and C is J.R. Having determined that the Facebook messages do not meet the three-part test, we need not examine the second test.

[33] We conclude that the State did not present evidence that B.T.E. completed a substantial step toward the commission of the crime of aggravated battery. Accordingly, the court's true finding that B.T.E. committed a delinquent act which would constitute attempted aggravated battery must be reversed.[4]

---

[4] Because we reverse the true finding, we need not address the argument raised by B.T.E. in this section of his brief that the court abused its discretion in admitting the Facebook communications between B.T.E. and D.H.

## B. *Conspiracy To Commit Aggravated Battery*

[34] Again, the statute defining Aggravated Battery provides that a "person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death . . . commits aggravated battery, a Level 3 felony." Ind. Code § 35-42-2-1.5. Also, a person "conspires to commit a felony when, with intent to commit the felony, the person agrees with another person to commit the felony." Ind. Code § 35-41-5-2(a). The State "must allege and prove that either the person or the person with whom he or she agreed performed an overt act in furtherance of the agreement." Ind. Code § 35-41-5-2(b). In other words, to prove the conspiracy aspect of the State's allegations, the State had to prove that B.T.E. and M.V. formed an agreement to commit the crime and that one of them took an overt act in furtherance of that agreement.

[35] B.T.E. argues that independent proof of the existence of a conspiracy is required before statements of a coconspirator can be admitted under Ind. Evidence Rule 801(d)(2)(E). He asserts that, here, "[n]o evidence, other than the hearsay statements of the alleged coconspirator, M.T.V.[,] were offered in support of a conspiracy agreement." Appellant's Brief at 20-21. B.T.E. argues that, "[d]espite the trial court's initial indication of understanding the requirement of independent evidence before the introduction of hearsay testimony," it "expressly found the existence of a conspiracy based upon an agreement to commit aggravated battery against J.R. which was reached by B.T.E. and M.T.V. 'through a series of Facebook messages.'" *Id.* at 21.

[36] The State argues that the evidence presented was sufficient to show that B.T.E. and M.V. agreed to significantly injure or kill J.R. during a school shooting on a specific date. Specifically, the State asserts that M.V. made a threat toward the school on January 13, 2016, that B.T.E. "admitted in an interview with police that he planned to shoot up the school on April 20, 2018" in which J.R. and G.M. were specifically targeted and M.V. had agreed to help carry out the shooting, that B.T.E. sent M.V. instructions on how to construct a pipe bomb, and that B.T.E. wrote to M.V.: "4/20/18; some people will find out what the state of nothingness is like :)" and "*gunfire* you better hope I don't f------ miss; *hits [J.R.] behind you*; *pits [sic] three more shots into [J.R.'s] head before turning and shooting past you into the classroom on your left hitting [G.M.] in the forehead." Appellee's Brief at 25. The State argues that if M.V. did not agree with B.T.E. to commit the shooting, then he would not have made the threat on January 13, 2016, and would have reported B.T.E.'s plan to someone. It states that "[t]he most telling evidence of the agreement between [B.T.E.] and M.V. to injure or kill J.R[.] is found in their Facebook messages" which spanned almost three months and include statements detailing horrific injuries they planned to inflict upon him. Id. at 26. It argues that B.T.E. made several overt acts in furtherance of the agreement, including drawing diagrams of the building and a classroom that he shared with J.R., marking the names of teachers of specific classrooms, noting doors to enter each classroom, and labeling J.R.'s seat in a classroom using an "X." Id. at 27. The State asserts that B.T.E. also researched how to build a pipe bomb and shared this research with M.V., and notes that M.V. instructed B.T.E. how to conceal the crime and

avoid becoming a murder suspect by telling him what to wear and how to conceal his tracks.

[37] To prove the existence of a conspiratorial agreement, "it is not necessary to present direct evidence of a formal express agreement between conspirators." *M.T.V. v. State*, 66 N.E.3d 960, 965 (Ind. Ct. App. 2016) (quoting *Chambers v. State*, 526 N.E.2d 1176, 1178 (Ind. 1988)), *trans. denied*. Rather, "[s]uch intent may be inferred from circumstantial evidence alone, including overt acts of the parties in pursuance of the criminal act." *Id.* (quoting *Chambers*, 526 N.E.2d at 1178). As to the overt act, it "need not rise to the level of a 'substantial step' required for an attempt to commit the felony." *Id.* (quoting *Owens v. State*, 929 N.E.2d 754, 756-757 (Ind. 2010), *reh'g denied*). Indeed, whereas a substantial step must be an act beyond mere preparation, there is no such requirement for an overt act. *Id.* Ultimately, "[t]he crime of conspiracy is complete upon the agreement and the performance of an overt act in furtherance of the agreement." *Id.* Thus, the length of time between the overt act and commission of the underlying felony, if ever committed or attempted, is "of no significance to the elements of the crime [of conspiracy] itself." *Id.* (quoting *Smith v. State*, 655 N.E.2d 532, 540 (Ind. Ct. App. 1995), *reh'g denied*, *trans. denied*).

[38] The State alleged the following in the delinquency petition:

> The undersigned says that between October 31, 2015, and January 15, 2016 . . . [B.T.E.] did knowingly or intentionally conspire with [M.V.] to inflict injury on J.R. that created a

substantial risk of death, and B.T.E. did perform an overt act in furtherance of the agreement, to wit: drawing a map of a classroom searing [sic] chart with J.R.'s seat targeted, drawing a map of the 300 building of Seymour High School, setting a specific date for a school shooting to occur at Seymour High School, writing death letters in preparation of the act, researching information regarding how to make a pipe bomb, discussed stealing a knife from school, discussed how to conceal murder evidence, discussed torturing J.R. prior to killing him, and/or planned to break into his parent's gun safe contrary to the form of the statutes in such cases made and provided by I.C. 35-42-2-1.5, I.C. 35-41-5-2, and against the peace and dignity of the State of Indiana.

Appellant's Appendix Volume 2 at 128.

[39] Additionally, the court in its Order on Fact Finding Hearing entered on May 24, 2016, identified the following overt acts committed by B.T.E. in furtherance of the conspiracy:

a. Creation of a diagram of the classroom seating chart for Ms. Buchanan's room with J.R.'s seat marked, State's Exhibit 4.

b. Drawing a map of the 300 building of Seymour High School, State's Exhibit 5.

c. [B.T.E.], together with his co-conspirator [M.V.], in furtherance of the conspiracy committed the following overt acts together including planning committing aggravated battery and torturing J.R., planning to break into [B.T.E.'s] parents' gun cabinet to obtain a gun, and planning to to [sic] conceal the crime and evidence. [B.T.E.] conducted research to build a pipe bomb and sent the research to [M.V.] on Facebook in furtherance of the conspiracy, State's Exhibits 4-19 and 25-34. . . .

*Id.* at 179.

[40] The evidence favorable to the adjudication included the diagram of the classroom and the map of the 300 building, which were recovered from B.T.E.'s binder. The classroom diagram marked with an "X" where J.R. sat. The map of the 300 building identified classrooms and points of exit. Also, on December 7, 2015, B.T.E. sent detailed instructions to M.V. for how to construct a pipe bomb, which was the fruit of his research on "school shootings influenced by columbine." State's Exhibit 27. In addition, B.T.E. and M.V. discussed via Facebook how to conceal involvement in violent crime by wearing different clothes and shoes, or else shoes with no traction and to "make it look like you were looking for something on them so it appears to be a robbery over a specific item that you would never need." State's Exhibit 31. B.T.E. specifically asked M.V. to help him carry out a plan to attack the school on April 20, 2018. B.T.E. stated that he would do things to J.R. that "would make even the sociopathic of sociopaths shake and stutter" and that he hoped he "dies a slow and painful death that lasts for days." Transcript Volume 3 at 33; State's Exhibit 8. On November 12, B.T.E. and M.V. discussed torturing J.R. by inflicting "[a]s many cuts as possible" or by using an "[i]mplement through the ass and out the mouth." State's Exhibit 29. They discussed either stealing a knife or breaking into B.T.E.'s parents' gun safe to take a gun in order to attack J.R.

[41] We find that there is substantial evidence of probative value to support the factfinder's determination that B.T.E. and M.V. formed an agreement to inflict

injury on J.R. during a school shooting to be carried out on April 20, 2018, that would create a substantial risk of J.R.'s death. B.T.E.'s argument amounts to a request to reweigh the evidence, which we will not do. *J.R.T.*, 783 N.E.2d at 302. We conclude that there is sufficient evidence to support the true finding. *See M.T.V.*, 66 N.E.3d at 967 (holding that the evidence was sufficient to support the true finding that defendant M.V. and co-conspirator B.T.E. committed a delinquent act which would constitute conspiracy to commit aggravated battery if committed by an adult).[5]

## *Conclusion*

[42] For the foregoing reasons, we affirm the juvenile court's true finding that B.T.E. committed the delinquent act which, if committed by an adult, would constitute conspiracy to commit aggravated battery, and reverse its true finding that he

---

[5] B.T.E. also raises the issue of whether the court committed fundamental error by depriving him of fair notice of the allegations against him. He argues that the Indiana Supreme Court's opinion in *Young v. State*, 30 N.E.3d 719 (Ind. 2015), requires reversal based upon "fair notice" of the allegations in the delinquency petition as to the "means used" in committing the delinquent acts. B.T.E. specifically asserts that "[n]owhere in the original, first amended or second amended charging information" of the conspiracy charge are there references to an act of solicitation of D.H., "[y]et the trial court found that [he] had committed both aggravated battery and conspiracy to commit aggravated battery in part based upon the determination" that he "solicited assistance from D.H. to commit the offense of aggravated battery against J.R." Appellant's Brief at 23.

The court admitted the Facebook messages exchanged between B.T.E. and D.H. as to the attempt allegations and sustained B.T.E.'s objection based upon relevancy as to the conspiracy counts. Thus, because we reverse B.T.E.'s true finding on the attempted aggravated battery allegation, we need not address this issue. To the extent that the court mentioned the solicitation in its order on Fact Finding Hearing entered on May 24, 2016, as an overt act in furtherance of the conspiracy, as noted above the court identified numerous overt acts performed in furtherance of the conspiracy based upon the evidence presented, including drawing the map and the diagram, researching how to construct a pipe bomb, and planning to hurt and torture J.R. These overt acts are sufficient to affirm B.T.E.'s true finding on the allegation that he committed a delinquent act which would be conspiracy to commit aggravated battery if committed by an adult.

committed the delinquent act which, if committed by an adult, would constitute attempted aggravated battery.

[43] Affirmed in part and reversed in part.

Vaidik, C.J., concurs.

Bradford, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

B.T.E.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

August 9, 2017

Court of Appeals Case No.
36A05-1607-JV-1702

Appeal from the Jackson Superior
Court

The Honorable Bruce A.
MacTavish, Judge

Trial Court Cause No.
36D02-1601-JD-3

**Bradford, Judge, concurs in part and dissents in part with opinion.**

[44] I concur with the majority's affirmance of the juvenile court's denial of B.T.E.'s motion to dismiss and the true finding that B.T.E. committed conspiracy to commit aggravated battery. I cannot agree, however, that the State failed to produce sufficient evidence to support the juvenile court's conclusion that B.T.E. committed what would be Level 3 attempted aggravated battery if committed by an adult. In my view, the record contains sufficient evidence to sustain a finding that B.T.E. took a substantial step toward committing aggravated battery. Consequently, I respectfully dissent from the majority's disposition of this issue.

[45] Pursuant to Indiana Code subsection 35-41-5-1(a),

[a] person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony or misdemeanor of the same level or class as the crime attempted.

[46] As the Indiana Supreme Court has noted, "[a] statute of this type makes possible some preventive action by police and courts to stop the criminal effort at an earlier stage, thereby minimizing the risk of substantive harm without providing immunity for the offender." *Zickefoose v. State*, 270 Ind. 618, 622, 388 N.E.2d 507, 509 (1979). Indiana's general attempt statute was modeled after Section 5.01 of the American Law Institute's Model Penal Code, and Indiana appellate courts have consistently looked to the section's provisions for guidance. *See, e.g.*, *Zickefoose*, 270 Ind. at 622, 388 N.E.2d at 509 ("The statute is drawn substantially from section 5.01 of the American Law Institute's Model Penal Code (Proposed Official Draft 1962) and covers an area that had been treated only sparsely by prior Indiana case law."); *see also Collier*, 846 N.E.2d at 346 ("Indiana's general attempt statute is based on the Model Penal Code approach to attempt liability.").

[47] Section 5.01 provides, in part, as follows:

> (1) **Definition of Attempt.** A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
> ….
>> (c) purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

(2) **Conduct That May Be Held Substantial Step Under Subsection (1)(c).** Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:

> (a) lying in wait, searching for or following the contemplated victim of the crime;
> (b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;
> (c) reconnoitering the place contemplated for the commission of the crime;
> (d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;
> (e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;
> (f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;
> (g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

[48] "To establish an attempt, the State must prove that the defendant acted with the culpability required, and that the defendant engaged in conduct constituting a substantial step toward commission of the crime." *Minter v. State*, 653 N.E.2d 1382, 1383 (Ind. 1995). B.T.E. contends, and the majority agrees, that the State failed to produce sufficient evidence to establish a substantial step in a course of conduct to culminate in aggravated battery. "What constitutes a substantial step must be determined from all the circumstances of each case, and the conduct must be strongly corroborative of the firmness of the defendant's criminal intent." *Zickefoose*, 270 Ind. at 622-23, 388 N.E.2d at 510. "The

substantial step element of attempt requires proof of any overt act beyond mere preparation and in furtherance of the intent to commit the crime." *Jackson v. State*, 683 N.E.2d 560, 566 (Ind. 1997). "Whether a substantial step has occurred is a question of fact, to be decided by the jury, based on the particular circumstances of each case." *State v. Lewis*, 429 N.E.2d 1110, 1116 (Ind. 1981).

[49] In my view, given B.T.E.'s voluminous communications regarding his desire to kill J.R., there can be little doubt that there is ample evidence to support a conclusion that he intended to do him harm. The only real question, then, is whether B.T.E. acted in a way strongly corroborative of that criminal intent. I start, as Judge Barnes did in his dissent in *Collier*, with the principle that the determination of what constitutes a substantial step is for the fact-finder, in this case the juvenile court. The juvenile court specifically identified B.T.E.'s preparation of maps (uncovered during a search of his home) of (1) a certain classroom at Seymour High School with J.R.'s seat marked and (2) the 300 building of Seymour High School. The preparation of maps of the anticipated scene of the Columbine-style attack on J.R. are "overt acts" that, moreover, indicate that B.T.E. also acted overtly in evaluating the scene. This conduct clearly qualifies as "reconnoitering the place contemplated for the commission of the crime[,]" an act specifically identified in Section 5.01 as conduct that may be held to be a substantial step. Finally, I would have little trouble affirming a finding that B.T.E.'s conduct is strongly corroborative of his frequently-stated intent to do J.R. harm. A map of a classroom with J.R.'s seat crossed out

might only be more corroborative of criminal intent if B.T.E. had written "intended victim" with an arrow pointing to the seat.

[50] Moreover, I consider B.T.E.'s preparation of his "death note" to be "strongly corroborative of the firmness of [his] criminal intent." *Zickefoose*, 270 Ind. at 622-23, 388 N.E.2d at 510. The death note, admitted as State's Exhibit 3, is a handwritten letter to M.V. found in the search of B.T.E.'s home. In the death note, B.T.E. begins, "[i]f you are reading this then I have gone. Either by running away, or by death. I have written you this death note in case of this (you should already know)." State's Ex. 3. B.T.E. continues, listing several persons and what he thought of them "so [M.V. could] tell them how I felt[.]" State's Ex. 3. With the death note, B.T.E. seems to be attempting to "put his affairs in order" in the event of his death, a not-at-all-unlikely outcome if he attacked or killed J.R. using a firearm in Seymour High School. I consider B.T.E.'s death note to be strongly corroborative of the firmness of his intent to attack J.R. in school. I would affirm the juvenile court's conclusion that B.T.E. committed what would be Level 3 attempted aggravated battery if committed by an adult.

[51] I acknowledge that this court, based on what are arguably stronger facts, has reversed attempt convictions in *Collier* and *Calvert* and has affirmed the dismissal of charges in *State v. Kemp*, 753 N.E.2d 47 (Ind. Ct. App. 2001), *trans. denied*. The facts of *Collier* and *Calvert* have been thoroughly discussed by the majority, so I will not repeat them. In *Kemp*, the defendant arranged over the internet to meet with a person he believed was an underage girl for sex. *Id*. at

48. Kemp drove to the agreed-upon meeting place, where he was arrested by the detective who had been posing as an underage girl. *Id*. A grocery bag containing a package of condoms was found in Kemp's vehicle. *Id*. The trial court dismissed attempted child molesting charges against Kemp, concluding that his actions amounted only to preparation or planning. *Id*. at 51.

[52] Had I been on any—or all—of the panels that decided these cases, I would have dissented as I do here. All three cases involved at least one of the circumstances specifically mentioned in Section 5.01 that "shall not be held insufficient as a matter of law": in *Collier*, the defendant followed the intended victim to work, laid in wait, and possessed material to be used to commit the crime; in *Calvert*, the defendant was in a vehicle near a liquor store that contained a sawed-off shotgun, multiple BB pistols, three pairs of sunglasses, and ski masks; and in *Kemp*, the alleged perpetrator was apprehended at the predetermined rendezvous with condoms. As for whether these acts were "substantial steps" or were "strongly corroborative" of criminal intent, I would have left that to the fact-finder.

[53] I therefore concur in part and dissent in part.